522 So.2d 731 (1988)
ESTATE OF Gertrude McRAE, Deceased.
Dorothy ROCKWELL & Mary Spikes, Co-Executrices; et al.
v.
J.W. WATKINS, Sarah W. Watkins McLain and David J. Watkins.
No. 57176.
Supreme Court of Mississippi.
January 13, 1988.
Rehearing Denied April 20, 1988.
*732 Robert D. Jones, Martin & Jones, Walter T. Rogers, Meridian, for appellants.
Thomas R. Jones, J. Richard Barry, Bourdeaux & Jones, Meridian, for appellees.
Before HAWKINS, P.J., and ANDERSON and GRIFFIN, JJ.
HAWKINS, Presiding Justice, for the Court:
On April 28, 1978, 78-year-old Gertrude McRae conveyed 365 acres and her home to her physician, reserving a life estate, and leaving four siblings with no interest in any of her real property. On the same day, Dr. Watkins signed an agreement obligating himself to render his medical services to Miss Gertrude (so called by those who knew her) free of charge for the rest of her life. Five months later, Dr. Watkins' tax attorney warned the doctor that the deed might be deemed payment for services rendered and result in income tax. On September 22, 1978, Dr. Watkins conveyed the property back to Miss Gertrude by quitclaim deed, and both signed an agreement rescinding the prior agreement to provide medical care. The next day, Miss Gertrude conveyed the same property to Sarah McLain and David Watkins, children of Dr. Watkins, by general warranty deed. The only consideration was the $10 recited by the deed. After Miss Gertrude's death on June 26, 1983, her heirs petitioned to have the deed set aside. The chancellor found that the deeds were gifts needing no consideration, that Miss Gertrude's mental incapacity was only intermittent, and that Miss Gertrude had the benefit of the advice of meaningful, independent counsel and, therefore, Dr. Watkins had successfully rebutted the presumption of undue influence that arose from the confidential relationship between him and his patient. Miss Gertrude's four siblings appealed the chancellor's failure to set aside the deed.
For the reasons herein stated, we find that meaningful independent advice was not given to Miss McRae, and therefore Dr. Watkins failed to rebut the presumption of undue influence arising from these conveyances. We accordingly reverse and render judgment for the appellants.

FACTS
Gertrude McRae was born August 11, 1900. Since age 19 she had lived in a log cabin house built around 1845 located on approximately 360 acres that had been in her family longer than the house had been standing. The land was located near Quitman in Clarke County.
Miss Gertrude never married. As she grew old, Miss Gertrude, an obese woman, started suffering from diabetes, arteriosclerosis or hardening of the arteries, arthritis in her knee and spine, and congestive heart failure. From February 26, 1975, to the date of execution of the first deed to Dr. Watkins, Miss Gertrude was hospitalized five times.
From February 26 to March 11, 1975, Miss Gertrude was in the hospital because of severe diabetes, thrombophlebitis and *733 arthritis. She was hospitalized from July 12 to July 22, 1975, for a urinary tract infection as well as for ailments that continued to plague her after her stay in February and March. She was hospitalized for one month during September and October, 1975, and was diagnosed as having a diabetic coma, heart failure, and pulmonary embolies. In April, 1976, she was hospitalized for three days to be treated for gastroenteritis and dehydration. The fifth hospitalization occurred from June 10 to June 28, 1977, when she was again diagnosed with diabetes and arteriosclerosis.
During each of these hospitalizations, Dr. Watkins was Miss Gertrude's attending physician.[1] Dr. Watkins admitted her to the hospital in June, 1977, because, in his own words, she was "having hallucination" and was "very much mentally disturbed." Interspersed among these hospitalizations were a number of deeds, leases and other contracts executed by Miss Gertrude. The last of these transactions was her deed of all her real property to Dr. Watkins, her rescission of his agreement to provide free medical services, and her deed to Dr. Watkins' two children. The deed executed by Miss Gertrude to Dr. Watkins was unlike all the deeds and leases she had executed theretofore. The deed to Dr. Watkins reserved to Miss Gertrude only a life estate in the oil, gas and mineral rights. In every deed and lease prior to that deed, Miss Gertrude had reserved a fee simple to the oil, gas and mineral rights.
In February, 1978, two months before the first deed was executed, an attorney, Walter Rogers, visited Miss Gertrude to talk with her about someone stealing her timber. While they were talking, Miss Gertrude pointed to a truck crossing her property, to houses being built on her property, and to a thief sitting in the top of an old tree. Rogers was unable to see any of these phenomena and after going outside to look, he realized that they were a "figment of her imagination." Based on his 30-minute visit with Miss Gertrude, Rogers was of the opinion that she was not competent to execute the deeds of April and September.
One of Miss Gertrude's sisters, Dorothy Rockwell (Dot), came from Alabama to stay with Miss Gertrude during her hospitalization of June 10 to June 28, 1977. Dot testified that while Miss Gertrude was in the hospital, she would see people stealing her things and saw things up in the ceilings. Dot stayed with Miss Gertrude for three weeks, both at the hospital and at home. Miss Gertrude spoke to her of seeing trucks in her fields, people stealing peanuts, and people building houses up in the trees and building roads through her fields. Miss Gertrude was not growing peanuts at the time. Dot said that Miss Gertrude exhibited similar behavior during Dot's visit from August 13 to September 5, 1977.
Miss Gertrude maintained constant phone contact with Dot, calling her sister two or three times a day when Dot was not visiting in person. Miss Gertrude always reported that people had been stealing her things. On March 10, 1978, Miss Gertrude called to say it was snowing there every night.
Dot visited Miss Gertrude from August 10 to August 31, 1978. Dot's son, Joseph Rockwell, had to drive his mother from Alabama to Quitman, Mississippi, when she visited her sister. During this visit, Miss Gertrude was not eating right, not sleeping, she was reading at 3:00 a.m. and would step outside at night whenever she thought she heard someone. Dot noticed holes in the screen that enclosed the porch. These holes were made by Miss Gertrude firing her gun from her porch.
Rita Bailey and her mother rented a house from Miss Gertrude not far away from Miss Gertrude's residence. Her mother, Mrs. Mary Spikes, was Miss Gertrude's sister. In July, 1977, Miss Gertrude saw things that Rita could not see. Miss Gertrude vehemently accused Rita of *734 being wilfully blind. In June of the same year, Rita went to Miss Gertrude's house with the constable at his request. Miss Gertrude was standing on the front porch holding her .22 rifle. Handfuls of empty shells were on the front porch and lying in the yard. While the constable walked Miss Gertrude back into the house, Rita took the gun and cartridges and locked them in the trunk of her car. When Rita called Dr. Watkins to report the incident, he made a housecall. Dr. Watkins persuaded Miss Gertrude to ride with him to the hospital.
At the hospital, Dr. Watkins told Mary Spikes and Edwina Hansen, another of Miss Gertrude's sisters, and Rita that he was not surprised at Miss Gertrude's condition. In fact, he was surprised that it had not happened sooner and expected that she would steadily get worse. He offered to commit her if they wanted him to sign the papers. The ladies rejected the offer. This conversation occurred in June, 1977.
In September, 1977, Rita and the constable found Miss Gertrude behind the washhouse and outhouse swinging her walking stick over her head "fighting off devils." Rita and the constable disarmed her. During June and September, 1977, Rita observed pock marks in the floor and in the walls around Miss Gertrude's window in the back bedroom. Miss Gertrude said she had been beating the devils away with her walking stick.
Rita had been an accountant for 45 years. Early in 1976, Miss Gertrude became agitated because keeping books had become too much for her to handle. Miss Gertrude asked Rita to help keep her bank account balance and to write checks and to keep a ledger of income and expenses. Rita also assisted Miss Gertrude in physically depositing income.
Mrs. Mary Spikes lived within walking distance of her sister. In June, 1977, Mrs. Spikes also accompanied the constable to Miss Gertrude's house to find Miss Gertrude holding a gun and the ground littered with shells. That same month, Miss Gertrude told Mrs. Spikes that 28 Indians had held a wedding on top of her canned fruit house one night. The Indians also had a sick baby, left it on her doorstep, and Miss Gertrude tried to feed it.
Mrs. Spikes and Rita Bailey moved inside the Quitman city limits in February, 1978. Between the shooting incident and the time they moved, Miss Gertrude talked of seeing mules and trucks in the trees and she burned her fence railings. After they moved, Mrs. Spikes and Rita constantly visited and talked by phone with Miss Gertrude. Through her almost daily contact with Miss Gertrude, Mrs. Spikes learned that Indians were hauling off Miss Gertrude's timber and that old folks had dammed up the river, causing water to back up to Miss Gertrude's house. Mrs. Spikes' opinion was that Miss Gertrude was not competent; Miss Gertrude was a different person.
Miss Gertrude's sisters did not portray her as constantly out of her mind and incapable of coherent conversation. Dot Rockwell said that her sister sometimes told her things that were true.
Curtis Kennedy was a long-time tenant farmer who rented from Miss Gertrude up to December 31, 1977. Miss Gertrude frequently called him to come down and run Indians off the place. This happened in August, 1977. In May, 1977, Miss Gertrude called him on the phone to report that it was snowing.
After Kennedy left, Robert Price started farming 40 acres of Miss Gertrude's land in January, 1978. Price visited her three or four days out of the week throughout 1978. He sat in the kitchen and talked with Miss Gertrude. He said that for 10 or 15 minutes Miss Gertrude would make good sense and suddenly she would come up with an outlandish remark about somebody invisible to all but herself. She talked of seeing mules in the trees and people moving houses across the creek onto her land. Price offered his opinion that Miss Gertrude did not understand the consequences of signing the deeds of April, 1978, and September, 1978. She was, however, capable of arranging for him to farm the 40 acres rent-free in return for his buying groceries, delivering mail and running any other errands that she requested.
*735 Joseph Rockwell was Miss Gertrude's nephew. In June, 1977, he testified that Miss Gertrude fretted and accused people of getting everything she had  of hauling everything off. In a phone conversation in November, 1977, she reported that people were still stealing from her. Joseph was back in Quitman during August, 1978, on his birthday. Joseph saw marks on the chifforobe, the freezer and the logs in the wall above the freezer where Miss Gertrude had hit at devils with her walking cane. As he sat on her front porch with his eight-year-old son, Miss Gertrude described to the little boy how thieves were jacking up Joseph's car, taking the wheels off and disassembling it, and putting it up in the trees. It was also in August of 1978 that Miss Gertrude said that it was snowing. Joseph testified that there was a progression from accusing prominent people in 1976 to talking about Indians and devils in 1977 and 1978 as being the culprits for spiriting off her goods. Joseph testified that, in his opinion, Miss Gertrude was not capable of knowing what she was doing in September, 1978, when she signed the rescission and deeded her property to Dr. Watkins' two children.
When Dr. Watkins wrote his final diagnosis upon discharging Miss Gertrude from her hospital stay on June 28, 1977, he wrote, "This patient was admitted to the hospital having hallucination, very much mentally disturbed. She had been out in her garden and in the yard and seeing things, saying that she was shooting at people and so forth and so on." The nurses' notes from Miss Gertrude's stay in the hospital from September 23 to October 23, 1975, mentioned that Miss Gertrude was "talking confused." Notations on her record from her hospitalization in June, 1977, reveal that Miss Gertrude was "mentally confused" (June 15), that "patient's mental condition has deteriorated  very confused  hallucinating" (June 17); that she "continues to be mentally disturbed" (June 21); and, finally, that she is "doing better  discharged" (June 28). The nurses' notes from the same period disclose that Miss Gertrude "appears slightly confused" (June 18). The nurses' notes from December 28, 1979, report that "patient states that she can't find her false teeth  that she left them on the bedside table and two outlaws stole them while she was out of the room. No dentures found by nurses."
At various times Miss Gertrude was taking drugs prescribed by Dr. Watkins, such as Demerol, Dalmane, Dramamine and Vistaril. Generally, these drugs are of the nature of sedatives and tranquilizers and analgesics. Demerol is a narcotic qualitatively similar to morphine and can produce dependence like morphine. There is no record of how protracted her Demerol intake was. While taking an antihallucinate drug, Miss Gertrude continued to experience hallucinations.
The testimony of Miss Gertrude's family and neighbors was that, prior to the deeds of 1978, Miss Gertrude cut down bearing pecan trees to prevent the pecans from being stolen, she rolled up her rust-proof clothesline so that no one could steal it, she hung newspaper over her TV screen so people could not watch her television, she set fire to expensive pine rail fencing to keep people from stealing the fence rails, and she started giving things away to her family so that the items would not be stolen. She sold her timber in 1976 rather than have it stolen.
Dot Rockwell testified that Miss Gertrude repeatedly stated throughout the years "that we [siblings] did not ever want to let that land out of the family." Miss Gertrude expressed the wish that she could write her will to prevent the land from being sold outside the family. Rita Bailey testified that throughout Miss Gertrude's lifetime, Miss Gertrude said she would love to fix her will so that her brother and sisters could never sell the home place. Miss Gertrude wanted the family to keep up the log house as it had been over the years. Mrs. Mary Spikes testified, "As long as I can remember [Miss Gertrude] has said that she wanted the land to stay in the family and she wished it was possible to put it in a will that it could not be sold."
Except for two comparatively small gifts to a private college and a church, her 1967 *736 Will left all her real property and household furnishings to her siblings. Her 1976 Will devised all her property, real and personal, to her siblings. The Will provided that if any one of the siblings desired to sell his interest, the others would have the right of first refusal. Both wills had been prepared by her attorney of 15 years, A.J. Reese.
On April 28, 1978, Miss Gertrude signed a general warranty deed conveying 365.5 acres and the improvements thereon to Dr. Watkins.
Miss Gertrude's attorney, A.J. Reese, testified that Miss Gertrude conferred with him for one and one-half to two hours in person anywhere from three to five months before she had him draw up the deed. He testified that she also called him on the phone between the first conference and execution of the deed on some insignificant matter concerning the conveyance. On April 28, 1978, Reese said that he again spent at least an hour with Miss Gertrude in his office. Before he drew up the deed, he called Dr. Watkins and asked him to come to the office. Reese wanted to see what Watkins thought about being the recipient of the land.
Reese informed Dr. Watkins of Miss Gertrude's desire, and the three of them conferred for over an hour. Following this, Reese prepared a document headed "Agreement," whereby Dr. Watkins, in consideration of the conveyance, agreed to furnish Miss Gertrude all necessary medical services during her lifetime without financial charge to her or to himself; and, also, a warranty deed from Miss Gertrude to Dr. Watkins conveying the realty. The two instruments were taken by Dr. Watkins and Miss Gertrude to the chancery clerk's office where they were notarized and filed for record during the noon hour.
A chancery clerk and a former chancery clerk, who happened to be in the clerk's office doing title work, spoke to Miss Gertrude when she visited to get the deed acknowledged and recorded. The former clerk was in the vicinity for 15 or 20 minutes and heard the chancery clerk ask Miss Gertrude, "Do you understand what you have signed?" Miss Gertrude answered that she did and had gone "over it and over it." Both had known Miss Gertrude for several years and were of the opinion that Miss Gertrude knew what she was doing when she came to the office and was "as sane as anybody."
In September, 1978, Dr. Watkins' tax attorney discussed some misgivings about the conveyance with Dr. Watkins and Mr. Reese over lunch in the hospital cafeteria. The tax attorney foresaw that the deed would be considered income for services rendered in light of the Agreement signed the same day wherein Dr. Watkins agreed to provide to Miss Gertrude free medical attention as long as it required nothing out of his pocket. Mr. Reese soon received from the tax attorney mail containing a proposed quitclaim deed whereby Dr. Watkins would convey the land back to Miss Gertrude and an Agreement to Rescind whereby Miss Gertrude would release Dr. Watkins from the obligations of the Agreement to Provide Care.
Dr. Watkins signed the quitclaim deed. Reese visited Miss Gertrude at her home to get her signature on the rescission. The Agreement to Rescind and quitclaim deed are both dated September 22, 1978. The next day both Dr. Watkins and Reese visited Miss Gertrude's home. While they were at her house, Miss Gertrude signed a general warranty deed dated September 23, 1978, conveying the same land to Dr. Watkins' two children for no other consideration than the $10 recited in the deed. All three instruments were notarized by Reese as a notary public.
Reese considered the conveyance to Dr. Watkins a gift. Reese knew nothing about Gertrude's medical problems. While he could easily observe that she was elderly and overweight, she appeared perfectly rational to him. He was unaware, however, of any mental disturbances or hallucinations suffered by her. Dr. Watkins never told him about her mental or medical problems.
Neither  although he had prepared her 1976 Will devising her realty to her siblings and knew members of her family  did *737 Reese see any need to inquire of Gertrude why she was giving all her realty to Dr. Watkins. He concluded she was a person of independent judgment and strong will and capable of making this determination on her own.
At trial the chancellor found a fiduciary relation existed between Dr. Watkins and Miss Gertrude, wherein he was the dominant and she the dependent person. The chancellor further found, however, that Dr. Watkins had successfully rebutted the presumption of undue influence arising from this conveyance because Miss Gertrude had received independent counsel from a competent, disinterested person devoted solely to her interest, namely her attorney, Reese.

LAW
The legal principle which declares that a benefit conveyed by a beneficiary unto his trustee is presumptively void is not new. It was a long-settled principle of law prevailing in this country and Great Britain when this Court adopted it in Meek v. Perry, 36 Miss. 190 (1858). It has lost none of its vitality over the decades. See Hitt v. Terry, 92 Miss. 710, 46 So. 829 (1908); Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926); Bourn v. Bourn, 163 Miss. 71, 140 So. 518 (1932); Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959); Wofford v. Wofford, 244 Miss. 442, 142 So.2d 188 (1962); In re Will of Moses, 227 So.2d 829 (Miss. 1969); Hendricks v. James, 421 So.2d 1031 (Miss. 1982); Murray v. Laird, 446 So.2d 575 (Miss. 1984). While its application, like the tide, may ebb and flow, as long as cupidity and avarice remain a part of the human character, courts will retain this salutary principle.
Why is this rule necessary? It is because this is the only method available to frustrate the success of a greed in larcenous form, carried out with no one present but the dominant party and his dependent victim. It alone can nullify a closet advantage taken by the strong upon the weak and dependent, in which the male-factor only in the rarest instances would ever be detected.
This is why the law declares that when there is a fiduciary or confidential relation, and there is a gift or conveyance of dubious consideration from the subservient to the dominant party, it is presumed void. This is not because it is certain the transaction was unfair; to the contrary, it is because the Court cannot be certain it was fair. As stated in Meek v. Perry, 36 Miss. at 246, "if the court does not watch these transactions with a jealousy almost invincible, in a great majority of cases, it will lend its assistance to fraud." Further, this is a "policy of the law, founded on the safety and convenience of mankind ... preventing acts of bounty." And, the Court will not permit such a transaction to stand, "... though the transaction may be not only free from fraud, but the most moral in its nature." Id. at 247. "The rule of law in these cases is not a rule of inference, from testimony, but a rule of protection, as expedient for the general good." Id. at 244.
As the chancellor correctly found, a fiduciary relation existed between Dr. Watkins and Miss Gertrude. Hewett v. Bullard, 258 N.C. 347, 128 S.E.2d 411 (1962). As in Hitt v. Terry, 92 Miss. 710, 46 So. 829 (1908), it was of the closest kind, that existing between a physician and his patient whom he had known all of his life, and either he or his distinguished medical family had acted as her personal physician in this small community all of her life. She was a chronically and seriously sick woman who totally depended upon him for her medical care.

WAS THE PRESUMPTION OF UNDUE INFLUENCE REBUTTED?
The learned chancellor found, however, that the presumption of undue influence attending these conveyances was rebutted.
There was ample proof that Mr. Reese was Miss Gertrude's attorney and a person who either could have given, or seen to it that she received the independent counseling and advice that could have shown the independent consent and action that this Court requires to rebut such presumption. Regrettably, our inquiry cannot end on this *738 sanguine observation. The question is, did he?
This Court has never intended that the presumption of undue influence could be rebutted by a mere technical showing that a person who could have given such counseling talked to or generally "advised" the grantor. Ham v. Ham, supra; Croft v. Alder, supra; In re Will of Moses, supra. Precious little protection would be afforded by the presumption if it could be thus easily dissipated. The inquiry is whether the independent counselor did in fact give "meaningful" independent advice or counsel. Moses, supra, at 834. It is the responsibility of a court to make a nuts and bolts factual inquiry to answer the question whether meaningful independent advice has been given.
In Murray v. Laird, 446 So.2d 575, 578-79 (Miss. 1984), Justice Prather, for this Court, enunciated specific factors for a court to consider in determining whether meaningful independent advice had been given.
Murray held: "As a necessary adjunct to `advice and counsel', an advisor must have (a) knowledge upon which to base advice." Id. at 579. There can be no question but that in this case full information of Miss Gertrude's psychotic episodes was absolutely indispensable to any person with the responsibility of giving her meaningful counseling and assistance.

KNOWLEDGEABLE COUNSELOR
From this record it is as clear as a cloudless sunset over a calm bay that Miss Gertrude was quite a sick woman, hallucinating and paranoid with intermittently repeating psychotic delusions of being plagued by thieves, robbers and demons, antedating by at least a year the execution of these instruments.
Yet her counselor was totally ignorant of any of this.
Furthermore, the one person best able to supply him with this vital information  if her attorney was to give her meaningful advice  was Dr. Watkins. Although he saw and talked for over an hour with Mr. Reese on April 28, and had an opportunity to talk repeatedly with him until September 23, 1978, when the last deed was signed, on the subject of Miss Gertrude's hallucinatory episodes Dr. Watkins had all the garrulity of a cigar store Indian. There is not a single sentence in this record of Dr. Watkins telling Mr. Reese that Miss Gertrude suffered from mental problems which had at times degenerated into outright hallucinations.
Had Dr. Watkins been informed on April 28, 1978, that Miss Gertrude, who had planned all of her life to leave the family farm and residence to her brother and sisters, was contemplating giving it to a traveling faith healer, it is inconceivable to this Court that he would not have cautioned or warned Mr. Reese of her paranoia and hallucinations. Yet when he was the prospective recipient, instead of suggesting that her advisor be cautious, Dr. Watkins took it upon himself to determine that she was mentally capable of making this decision. He told no one else. This was not a question that he, the prospective beneficiary, should have taken upon himself to decide. A doctor who stands to benefit from the grantor's act should defer to independent medical opinion just as an attorney who stands to benefit from a deed or will should send the potential client to seek independent legal advice. Toomey v. Moore, 213 Or. 422, 325 P.2d 805, 810 (1958).
Had Dr. Watkins told Mr. Reese of her hallucinations and delusions, he no doubt would have made a discreet inquiry from her kin, her acquaintances and the nurses about her conduct, and questioned her closely himself. He most assuredly would have done more than he did in this case. It may very well be that at the time Mr. Reese saw Miss Gertrude she manifested no symptoms of psychosis and, being unaware of her paranoia, he assumed that all was well with her. Had she responded affirmatively, however, to a question from Mr. Reese as to whether she expected snow in Clarke County in late April or whether mules were still in her trees, we cannot doubt that he would never have acted as *739 her attorney to give her land away in the fashion revealed by this record.
Meaningful advice, as we contemplate it, on this vital matter was absent in this case. Nor was there any other indication that the grantor's action was independent, as there was in Mullins v. Ratcliff, 515 So.2d 1183 (Miss. 1987).

FAMILY AND LAND VALUE
Other lessons from Murray were ignored.
Mr. Reese knew, of course, that Miss Gertrude was a spinster, and that she lived on land and in a pre-Civil War home which descended from her parents and grandparents. He knew her expressed desire  not momentarily, but over her many adult years  that the land and the old home remain in her family. Indeed, she intended that if any member of the family to whom the land was devised wished to sell his interest, he would first offer it to another member of the family. This had been set forth in two wills, one signed in 1967 and the other in 1976.
Yet, when Miss Gertrude abruptly changed courses, first deciding to convey the land to Dr. Watkins and later giving it outright to his nonresident children, the record does not reveal one sentence of Mr. Reese ever asking her why she was doing this. Such a question was of the utmost importance if Mr. Reese was to counsel her. She may have given him a perfectly valid reason. On the other hand, her answer may have been a positive clue that she was acting under some paranoid delusion, or thought she was doing Dr. Watkins' bidding, or both. We can never know, of course. What is certain is that a very important question was never asked.
Though Mr. Reese discussed with Miss Gertrude the fact that the land was valuable, she was never asked what her land was worth, whether she was aware of its worth or of what she was doing. Mr. Reese quite candidly testified that he was confident, from his past experience with her, that she was fully capable of making up her own mind.
Murray held:
Factors important to address the grantor's knowledge, at the time of execution of any instrument are (a) his awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether the non-relative beneficiary would be excluded or included ...
446 So.2d at 579.
We must conclude, therefore, from this record that Dr. Watkins failed to prove that Miss Gertrude acted independently or with the full knowledge and deliberation contemplated by established judicial precedent in this State, and specifically enumerated in Murray v. Laird, supra, and that the learned chancellor was manifestly wrong when he held to the contrary.
A showing of independent advice and counsel was not needed in Mullins v. Ratcliff, supra, to rebut the presumption of undue influence; the presumption was rebutted by other facts: (a) the conveyance was between siblings, where one is naturally an object of the other's affections, and not between patient and doctor; (b) the conveyance was to a sibling who had taken the grantor into her home as a permanent resident; and (c) the grantor expressed his intent to so dispose of his land a few years prior to doing so and, long after the conveyance, he told a disinterested third party of his act and gave a good reason for his action. Mullins avoided the pitfall of requiring compliance with safety measures when the danger had been otherwise averted.
The lofty language of Meek v. Perry, supra, and the specific factors set forth in Murray v. Laird, supra, give the attorney almost foolproof guides when he is presented with a confidential relationship transaction. There no doubt are many transactions in which no unfair advantage whatever *740 has been taken of the dependent person. Faithful, painstaking adherence to the precepts of our decisions can assure that a conveyance or devise to the dominant person in a confidential relation will be upheld, because the examining court can know of a certainty that it should be upheld. When the lessons are ignored, however, and the court cannot be satisfied that it was the free and voluntary act of the grantor or testator, it is our plain responsibility to set such conveyance or devise to the dominant party in a fiduciary relationship aside.
We have no duty more solemn than upholding a genuine conveyance or devise of a person now deceased. Commensurate therewith, however, is the duty just as solemn to prevent undue influence from being exerted by the dominant party to a confidential relation on the party dependent upon him. Jamison v. Jamison, 96 Miss. 288, 51 So. 130 (1910).
A fiduciary relation having existed between Dr. Watkins and Miss Gertrude, and the presumption of undue influence arising over the conveyance from Miss McRae first to him, and then to his children not being rebutted, it follows that the warranty deed to Sarah W. McLain and David J. Watkins dated September 23, 1978, was invalid.
The decree of the chancery court is therefore reversed, and judgment is rendered in favor of the appellants.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
NOTES
[1] The proffered testimony of Dr. Watkins was that his late father, a practicing physician until his death in 1962, treated her during his lifetime. Following that his late brother, also a practicing physician until his death in 1971, treated her. Following his brother's death, Dr. Watkins became the personal physician of Miss Gertrude.