543 So.2d 1155 (1989)
Danny L. LOWREY
v.
In the Matter of the Last WILL and Testament OF Lois Elizabeth Vinson SMITH, Deceased.
No. 58371.
Supreme Court of Mississippi.
March 29, 1989.
Danny L. Lowrey, Corinth, for appellant.
Shelby D. Goza, Ethridge, Grisham & Goza, Oxford, for appellee.
Before HAWKINS, P.J., and PRATHER and ROBERTSON, JJ.
HAWKINS, Presiding Justice, for the Court:
This is an appeal from a decree of the chancery court of Lafayette County entered on December 23, 1986, finding that Danny L. Lowrey (Lowrey), attorney, breached a fiduciary relationship with David Carter Smith and Lois Elizabeth Vinson Smith (David and Lois) and failed to overcome the presumption of undue influence thereby necessitating the return of funds taken by Lowrey taken from a checking account on which the names of David Smith, Lois Smith and Danny Lowrey were all listed with right of survivorship. The estate of Lois Smith through M.B. Spencer, administrator de bonis non, cross-appeals a separate judgment entered on January 26, 1987, finding the estate owed Lowrey $6,666.66 on an unpaid claim for attorney's fees.
The issues we address on direct appeal are whether the chancellor erred in denying Lowrey's defense of wrong venue, and that venue should have been changed from Lafayette County to Alcorn County, the county of Lowrey's residence; and in holding the presumption of undue influence required that Lowrey restore the funds he removed for his personal use from the joint *1156 checking account. We find no error on the direct appeal and affirm.
On the cross-appeal we likewise affirm.

FACTS
Between 1976 and 1979 Lowrey attended the University of Mississippi Law School in Oxford. He, his wife Mary Ann and six-month-old son lived in a duplex in Oxford. Living in the other section of the duplex were Katie Bell and Eleanor Lindenburger, elderly aunts of Lois. During visits with these aunts by David and Lois, Lowrey and Mary Ann became acquainted with and eventually became close friends of David and Lois.
Following graduation from law school in 1979, Lowrey and his family moved to Alcorn County. However, they kept in frequent and close contact with the Smiths. Additionally, Lowrey performed legal services for the Smiths including advising the Smiths on their wills and preparing codicils thereto in November, 1979; opening an estate of which Lois was executrix in February, 1980; and closing the same in August, 1980; preparing new wills for the Smiths in April, 1981; representing the estate of David following his death in July, 1985. with Lois as executrix; and representing Lois on an insurance claim in July, 1985. Lowrey was paid for all of these services, with the exception of the insurance claim, discussed infra.
According to Lowrey, in early 1985 Lois had become concerned that either she or David, who had Alzheimer's disease, might become incapacitated and be unable to care for themselves. Consequently, she approached Lowrey about agreeing to care and provide for the Smiths should something happen to one or the other of them. Lowrey suggested to Mrs. Smith that she have a conservatorship set up; however, when Lois asked Lowrey could she be guaranteed that he would act as conservator, Lowrey advised her that there was no guarantee of this and that a family member might be chosen over him. Consequently, Lois chose not to have a conservatorship set up. Instead she invited Lowrey and Mary Ann to her house on February 25, 1985, and then presented Lowrey with a signature card on the Smith's joint checking account at the First National Bank (the Bank) in Oxford, # 33-369-7. Lowrey signed the signature card giving him right of survivorship so, as he testified, that he could take money out of the checking account to care for Lois and David should they either or both become incapacitated. Specifically, according to Lowrey, if one of the Smiths died and the other was unable to care for himself or herself, then Lowrey was to write checks on the account to provide the welfare and upkeep of the survivor, and further, if any money remained in the account following both of the Smiths' deaths, Lois told Lowrey it would belong to him. Lowrey stated he did not know or ask how much money was in the account when he signed the signature card. Lowrey testified that on the day he signed the signature card, February 25, 1985, both Lois and David were aware of what they were doing and what they were asking Lowrey to do, and both agreed that they wanted Lowrey's name signed on the account with right of survivorship.
Subsequently on July 22, 1985, David died of a gunshot wound to the chest. He was alone in his bedroom at the time of the shooting and there was a question as to whether or not the wound was self-inflicted. Lowrey agreed to represent the estate and Lois as executrix of David's estate, and for this, he was paid a $300 retainer fee. Thereafter, on July 31, 1985, while at Lois's home, Lowrey was presented with a life insurance policy from Allstate Insurance Company (Allstate) on David in the amount of $20,000. Lois, noting a suicide exclusion clause, questioned Lowrey as to whether or not she would be able to make a claim from Allstate. Lowrey, stating that he knew the law in Mississippi regarding suicide exclusion clauses, told Lois that he believed that he could get a payment from Allstate. However, believing that the proceeds from this policy were separate from David's estate and consequently would pass out of the will, he felt a separate fee arrangement should be set up for this service. Consequently, on this day, July 31, 1985, according *1157 to Lowrey, Lois agreed to an oral contract of a one-third contingency fee of any amount which Allstate might agree to pay on the insurance policy. Thereafter, between July and November, 1985, Lowrey investigated the death of David by going to the Oxford Police Department, speaking with investigating officers, looking at and receiving reports on David's death and talking with Lois about the day of the shooting and events thereto. He also contacted Allstate and made a claim under the life insurance policy. On November 8, 1985, Lowrey received a telephone call from an Allstate representative stating that Allstate would pay the full $20,000 claim. The next day, November 9, 1985, Lois, who was then in a hospital in Memphis died. On November 11, 1985, Lowrey received written confirmation from Allstate that they had agreed to pay the $20,000 claim.
On November 19, 1985, Lowrey probated Lois's will. Under the terms of the will, Lowrey's wife Mary Ann acted as executrix. On November 20, 1985, Lowrey went by the Bank in Oxford, MS, and had the checking account # XX-XXX-X, which had $12,012.05 in it, changed solely to his name.
Following Lois's death, Lowrey wrote five checks covering expenses such as funeral bills and medical bills on Lois. Also, during November and December, 1985, Lowrey made two separate withdrawals from the account in the amounts of $7,000 and $4,700, which he transferred to his own account in a bank in Alcorn County. Lowrey stated these two withdrawals were for his personal use.[1]
Sometime following the probating of Lois's will, the residuary legatees began calling Lowrey and complaining because he had taken money out of the checking account and because Mary Ann was executrix.[2] Accordingly, on December 27, 1985, Lowrey and Mary Ann petitioned the chancery court to withdraw as counsel and executrix respectively. Thereafter, on December 30, 1985, M.B. Spencer, brother-in-law of David Smith, was made administrator d.b.n.
The Administrator filed a complaint to require Lowrey to give an accounting of the funds in the joint checking account.
Lowrey also probated a claim against the estate for $5,000 under his contract with Lois, later amended to $6,666. In his answer to the complaint, Larry raised the defense of wrong venue. The chancellor reserved ruling on the venue question.
At the hearing in chancery court held on November 5, 1985, Mrs. M.B. Spencer (Lucille Smith Spencer), a residuary legatee and sister of David, testified that in February, 1985, Lois had asked her to put her name on a joint bank account in case either she or David became incapacitated. However, a few days later, Lois told Mrs. Spencer that Lowrey had agreed to do it. Mrs. Spencer further stated that David was not always competent around the time of his death as he was suffering from Alzheimer's disease. Frances Hilburn, Judge L. Breland Hilburn and Frank S. Smith, Jr., also testified and stated that following the funeral of Lois, her heirs were called by Lowrey to meet at the funeral home. At this meeting Lowrey explained that he owned the funds in the bank account as his name was on the account with right of survivorship and, further, that his wife Mary Ann was acting executrix of the estate. These witnesses also testified that at this meeting Lowrey stated that the bank account contained $4,000, when actually there was over $12,000. At trial, however, Lowrey explained this $4,000 figure came from a telephone call from Frank Smith subsequent to the funeral during which Lowrey told Smith $4,000 remained in the account, as by this time Lowrey had already withdrawn $7,000 and transferred that to Alcorn County.
*1158 He also told the heirs about the life insurance policy on David, his one-third contingency fee contract with Lois, and that the insurance company was paying the claim of $20,000.
Following the hearing on November 5, 1986, the chancellor found that Lowrey, although not committing any civil or criminal wrong, had acted unwisely, had breached a fiduciary relationship with David and Lois Smith, and had failed to overcome the presumption of undue influence thereby necessitating the return of the $11,700 which he had transferred to Alcorn County from the bank account in Oxford.
The chancellor found that Lowrey had waived his right to have the venue changed from Alcorn County by failure to timely make a motion to change the venue.
Finally, the chancellor found that Lois and Lowrey had entered into a valid oral contract whereby Lois obligated herself to pay unto Lowrey one-third of all funds received under the insurance policy, and allowed his claim for $6,666.

LAW

I. VENUE QUESTION
In Mississippi venue is controlled by statute. Specifically, venue in chancery courts is controlled by MCA § 11-5-1 (1972) which states the following:
§ 11-5-1. Venue of Suits.
Suits to confirm title to real estate, and suits to cancel clouds or remove doubts therefrom, shall be brought in the county where the land, or some part thereof, is situated; suits against executors, administrators, and guardians, touching the performance of their official duties, and suits for an account and settlement by them, and suits for the distribution of personalty of decedents among the heirs and distributee, and suit for the payment of legacies, shall be brought in the chancery court in which the will was admitted to probate, or letters of administration were granted, or the guardian was appointed; other suits respecting real or personal property may be brought in the chancery court of the county in which the property, or some portion thereof, may be; and all cases not otherwise provided for may be brought in the chancery court of any county where the defendant, or any necessary party defendant, may reside or be found; and in all cases process may issue to any county to bring defendants and to enforce all orders and decrees of the court. [Emphasis added]
In a well-reasoned opinion, the chancellor explained why Lowrey had waived his right to change venue:

Rule 82 of the Mississippi Rules of Civil Procedure, sub-paragraph (b) entitled "Venue of Actions" says that "Except as provided by this rule, venue of all actions shall be as provided by statute."[3]
Sub-section (d) provides that in the case of improper venue, upon timely motion made by defendant, the action shall be transferred to a proper court. Rule 82 modifies Section 11-5-1 to the extent that the statute provides that all cases may be brought in the Chancery Court where a defendant resides, but upon timely motion the Court is then compelled by Rule 82 to transfer. So you come to the question of whether there was a timely motion made? How does this affect this particular action?
We go from there to Rule 12 of the Mississippi Rules of Civil Procedure. Rule 12(a) provides that a defendant must answer within 30 days after the summons and complaint was served upon him. Rule 12(b) provides that every defense to a claim for relief in any plea shall be asserted in the responsive pleading when it is required, except as to certain defenses  there are seven of them named  may at the option of the *1159 pleader be made by motion. One of those seven defenses, number three, is improper venue  improper venue.
Now, Section 12(h)(1) provides that a defense of improper venue is waived if it's neither made by motion or in a responsive pleading. In other words, it can be waived if it's not made by a motion or other responsive pleading.
What do the facts and the pleadings in this case reveal? The facts revealed are the following: On March 19, 1986, the estate acting through Mr. M.B. Spencer, Administrator  I guess you would call him de bonis non  the successor fiduciary. On March 19, 1986, he filed his petition for summons to be issued and for other relief... .
In response to the petition, a hearing was had before this Court. The Court made no particular adjudication of fact other than that a subpoena should be issued to Mr. Lowrey, who shall then present himself to the Court to account for the funds and to show cause why those funds should not be turned over to Mr. Spencer. In response thereto a summons was issued by this Court.
The defendant then filed, on May 7, 1986, his "Motion to Quash and Set Aside Decree." It was simply a Motion to Quash and Set Aside. Subsequently the Court heard the motion, and on July 1, 1986, a decree was entered denying the motion. On that very same day a second decree was issued by the Court authorizing the plaintiff to amend his pleading within a certain date, granted to the defendant a certain time within which to respond, and further granted both parties a certain date within which to complete discovery; and it then set the matter for hearing at a later date.
The plaintiff amended his petition and alleged the existence of a fiduciary relationship between Mr. Lowrey and the Smiths  that was done on July 8, 1986.
On the 22nd day of July, 1986, the defendant filed a Response to Petition for Summons to be Issued and for Other Relief. In his petition, for the first time, he raised the defense of improper venue, which is a defense authorized under Rule 12(b) of the Mississippi Rules of Civil Procedure. Now, the question arises before the Court as to whether or not the defense of improper venue was timely raised, or whether it was waived.
In the case of Belk v. State Department of Public Welfare, [473] So.2d 447 (Miss. 1985), our Mississippi Supreme Court held that in an in personam  in personam type action, venue, being a personal privilege, could be waived.
It's the opinion of this Court that the defendant, Lowrey, in this particular case, waived the right of raising the defense of improper venue when he failed to include that defense with his Motion to Quash and Set Aside the Decree. Now, the reason for that is simply that  Mr. Lowrey allowed the Court to rule on his Motion to Quash and to Set Aside Decree. In this Court's opinion he put all of his eggs in one basket. Since the Court has ruled against him he now wants this Court to rule in his favor to the defense of improper venue. This raises the question of which comes first the chicken or the egg? If the Court did not have proper venue in the first instance, then it could not have ruled on the Motion to Quash and Set Aside the Decree. Having granted to the Court the authority to hear the Motion to Quash and extending to the Court that authority without raising the defense of improper venue, he thus waived that defense. That's the judgment of the Court.
The chancellor correctly held that defects in venue are deemed waived if not timely asserted. Rule 12(h)(1), Mississippi Rules of Civil Procedure; H & W Transfer & Cartage Service v. Griffin, 511 So.2d 895, 901 (Miss. 1987); Belk v. State Dept. of Public Welfare, 473 So.2d 447, 451 (Miss. 1985). Moreover, since Lowrey agreed to act as de facto conservator for David and Lois, we find nothing startling in requiring such an individual under Miss. Code Ann. § 11-5-1 to be required to account for the funds in the county of their situs just as he would have been had he been appointed conservator by a court. Also, Miss. Code Ann. § 91-7-253.

*1160 II. UNDUE INFLUENCE
The record shows that both David and Lois were in their early 70s at the time of their deaths. While David had Alzheimer's disease with its consequent disability, the record does not disclose Lois having any disabling illness until the illness resulting in her death. Lois kept a careful record of their finances, was knowledgeable and independent.
David was a retired employee of the state highway department and Lois a retired employee of the Bell telephone system. No doubt both received retirement pensions, as well as social security retirement benefits.
They had no children, and none of the legatees lived in Oxford. Besides their residence, they had a personal liquid estate in excess of $200,000.
An examination of the will of Lois reveals nothing to indicate Lowrey acted other than honorably and dutifully to his trust as attorney. Neither he nor his wife were legatees, although she was named as executrix.
It clearly appears that both David and Lois thought a great deal of Lowrey and Mrs. Lowrey, and we have no difficulty in believing that David and Lois intended for any funds remaining in the joint account to be Lowrey's.
The record also reveals that Lowrey at his first opportunity upon Lois's death fully explained to the heirs about the estate, and Lois's desire that he have the funds in the joint checking account. The legatees lived some distance from Oxford, and it was not inappropriate for Lowrey to ask to meet them all immediately following Lois's funeral. That was the most convenient time and place for them, as they no doubt were about to return to their homes.
In holding, however, that Lowrey should have been required to restore the funds he removed from the joint checking account, we cannot improve upon the chancellor's reasoning, from which we quote at length:
It's the judgment of this Court that there was such a fiduciary relationship, but the same was accomplished without any intent, willful, criminal or civil, on the part of Mr. Lowrey to commit any wrongful act. In the opinion of this Court he simply acted unwisely.
* * * * * *
The proof is very clear to this Court from Mr. Lowrey himself, that the purpose of the joint account was specifically to provide access to those funds in the event David Smith or Lois Smith became physically and mentally impaired to the degree that they could not write checks against that account. It was to be used for their care and welfare. It's also abundantly clear to the Court that the parties apparently agreed if there were any monies remaining after the death of Mr. and Mrs. Smith those funds could belong to Mr. Lowrey... .
* * * * * *
[S]o there was a commingling of the relationship between Mr. Lowrey and the Smiths  commingled from a personal, ordinary type of relationship to that of attorney-client.
After the death of Lois  let me back up. At the time of her death, proof and testimony indicates that there was approximately $12,012.05 in the joint account number XX-XXX-X as evidenced by Exhibit No. 5.
* * * * * *
Mr. Lowrey proceeded to probate Mrs. Lois' will and as I stated, some of the heirs complained. Mr. Lowrey testified that his wife, Mary, was pregnant at that particular time. That the loss of Mrs. Lois bothered her. The constant inquiries made by the heirs, and their apparent dissatisfaction, and distrust caused her aggravation, plus the fact that she was suffering from the ills that women suffer during pregnancy; and she wanted out. She and her husband discussed it and they decided it would be better for them to withdraw their connection with the estate. Mr. Lowrey prepared the pleadings and his wife resigned as executrix. Mr. Spencer was subsequently appointed as her successor. Mr. Lowrey withdrew as attorney in the *1161 case. Mr. Goza was apparently later employed.
* * * * * *
We now come to where the fiduciary relationship impacts in this case. I stated very early in this case that I was concerned with the relationship between the parties because Mr. Lowrey is a lawyer. A fiduciary relationship can exist between anyone. You don't have to be a professional. It's a relationship in which confidence is reposed by one party and influence which naturally grows out of such confidence is possessed by the other. Not only does the dominant party wield influence, but that party is also in a position of superiority. You have two parties, a dominant or superior party, and an inferior party. The superior party has influence. The inferior party is influenced by the superior party. The relationship and the duties involved in that relationship are not necessarily legal. They may be moral, they may be social, they may be domestic, or, they may be merely personal.
If this confidential or fiduciary relationship is shown to exist, and this Court holds that such a relationship did, in fact, exist, then the next step the court must resolve is undue influence. Undue influence is presumed. The parties claiming the fiduciary relationship have the burden of proving it. Once it is proven and established, then the burden shifts back to the party claiming the contract or gift. It's a three-pronged burden that requires clear and convincing proof that one, there was good faith on his part; two, that the grantor had full knowledge and deliberation of his actions and its consequences; and, three, that there was competent, independent advice from a person disconnected from the claimant, Mr. Lowrey, and devoted wholly to the grantors, the Smiths. If these factors can be proven, then the presumption is overcome.
Now, the part that I think where Mr. Lowrey failed is that he should have advised Mrs. Lois or Mr. David to secure independent advice and counsel. An attorney involved in this type of a relationship is put on a spot.
* * * * * *
I think that Danny really cared. Danny was caught between a rock and a hard place. But he did not act wisely... .
Anyway, getting back to the law. The relationship between the attorney and his client is very, very highly fiduciary in nature and requires of that attorney the highest standard of good faith and fidelity. As was cited by Mr. Goza, in the case of Gwin v. Fountain, 159 Miss. 619, 126 So. 18 (1930), the Mississippi Supreme Court held as follows:
The relationship of attorney and client is one of special trust and confidence. The law requires that all dealings between them shall be characterized by the utmost fairness and good faith on the part of the attorney. So strict is this rule that dealings between an attorney and his client are held as against the attorney to be prima facie fraudulent and the attorney, in order to sustain such a transaction which is advantageous to him, has the burden of showing, not only that he used no undue influence, but that he gave his client all of the information and advice, which it would have been his duty to give if he, himself, had not been interested.
The law not only carefully watches over all transactions between attorney and client, to see that no advantage is taken of the client by his attorney, but it often goes further, and holds such transactions void, which between other persons would be held valid.
Some other Mississippi authorities on this subject are: Murray v. Laird, 446 So.2d 575 (Miss. 1984), and Hendricks v. James, 421 So.2d 1031 (Miss. 1982).
It's the opinion of this Court that Mr. Lowrey, unfortunately, failed to overcome the presumption. He did not meet the burden of proof. This case might have had a different conclusion if Mr. Lowrey were not a lawyer, and it's sad. I mentioned earlier that it could be construed *1162 as a form of punishment. On the other hand it could be construed as a rule of caution. As we who practice the profession of law know, the general public rates the morals and character of lawyers just below that of used car salesmen. Unfortunately we bring some of it upon ourselves. But I know in my heart, because I've learned to know lawyers as a result of my years on the bench, that that opinion is not deserving of most lawyers. Many lawyers are not calloused; many lawyers are not money hungry; many lawyers are caring human beings and are concerned. We must proceed in a matter such as this with the utmost caution, lest our actions be construed with greed. We must not be interested in lucre, which is a part of our oath. We will not be concerned with doing people in for money.
It's the judgment of this Court, therefore, that the defendant, Mr. Danny Lowrey, must return to its estate the $7,000.00 which he withdrew on November 20 1985, together with the $4,702.91 that was withdrawn by him during the month of December, 1985; a total of $11,702.91.
We agree. Also see, Miner v. Bertasi, 530 So.2d 168 (Miss. 1988); Angle v. Estate of Angle, 519 So.2d 883 (Miss. 1988); Estate of McRae, 522 So.2d 731 (Miss. 1988); Mullins v. Ratcliff, 515 So.2d 1183 (Miss. 1987); Blissard v. White, 515 So.2d 1196 (Miss. 1987).

THE CROSS-APPEAL: ORAL CONTINGENCY FEE CONTRACT
We begin with an analysis of whether a contingency fee contract in this case was unreasonable.
David had a $20,000 life insurance policy in effect with Allstate Insurance Company, with Lois the beneficiary. It had an absolute exclusion for:
1. Suicide while sane or self destruction while insane, or any attempt at either.
Lois was aware of this exclusion in the policy. It is also clear that Lois indeed believed David had committed suicide. The Oxford police department investigated David's death, and the report recited:
Mrs. Smith told officer victim under care of Dr. Cooper for prior heart attack and Alzheimer disease. She said he had been hurting badly and that is why he did it to relieve the pain and suffering.
With this claim of doubtful liability, there was nothing at all unusual or unfair for Lois or Lowrey to reach an agreement which was a gamble to Lowrey. If he recovered nothing, he received nothing. And, it would be difficult to conceive of a poorer witness in denying suicide than his client Lois. Indeed, Lois might very well have been unwilling to pursue the claim if she was going to have to spend money in attorney's fees.
Lowrey's serious problem arises from not seeing that the contract was reduced to writing. He certainly should have done so. Factors which the chancellor undoubtedly considered, however, were:
1. Lowrey was in Oxford and away from his office when Lois and he reached this agreement.
2. Lois was not only a client but a close personal friend, and he undoubtedly did not expect her to die. It was Lowrey who ran the risk in not reducing the contract to writing. Following some substantial recovery, there can be a temptation to a client to deny the contract. It showed his confidence in Lois in not reducing the contract to writing and seeing that she signed it.
3. Lowrey at the first opportunity informed the heirs of the insurance policy and his agreement with Lois.
4. While it is no doubt correct that at a flat, hourly rate, Lowrey did not put in $6,666 worth of time, he did have to put in time investigating David's death, securing and examining the death certificate, the police reports, conferring with representatives of Allstate, doing legal research, and otherwise pursuing this claim.
*1163 Rule 1.5(c) of the Rules of Professional Conduct (RPC) states in pertinent part:
(c) A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated.
Aside from this Rule, an attorney attempting to claim a fee under an oral contingency fee contract has the burden of proving by clear and convincing evidence that he fully disclosed all of the terms of the agreement to his client, that it was fair and reasonable, and above all was made in good faith. Fitzpatrick, et al. v. Kellner, 187 Miss. 843, 193 So. 911 (1940); Mercy Hospital, Inc. v. Johnson, 390 So.2d 103 (Fla.App. 1980); Kirby v. Liska, 214 Neb. 356, 334 N.W.2d 179 (1983).
The chancellor obviously found Lowrey had met this burden in approving the claim of $6,666 under the contract. We certainly cannot find that he was manifestly in error. While we would ordinarily be inclined to find that even where an attorney met these case law requirements, he was nevertheless obligated under Rule 1.5(c) of RPC to reduce it to writing, under the unusual facts of this case we believe it would be unduly harsh to deny Lowrey recovery under the agreement between Lois and him, and the chancellor was not manifestly wrong in approving it.
AFFIRMED ON DIRECT APPEAL AND CROSS APPEAL.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] These two withdrawals along with the funeral and medical payments for Lois left approximately $2.05 in the savings account. The account later went overdrawn when service fees were charged. (T-II. 223)
[2] The residuary legatees were Lucille S. Spencer, Ruth Smith Smith, Russell W. Sublette, Mrs. Marguerite Sublette Bullard, Mrs. Frances Holmes Smith Hilburn (wife of Hinds County Circuit Judge L. Breland Hilburn) and Frank S. Smith.
[3] (d) Improper Venue. When an action is filed laying venue in the wrong county, the action shall not be dismissed, but the court, on timely motion, shall transfer the action to the court in which it might properly have been filed and the case shall proceed as though originally filed therein. The expenses of the transfer shall be borne by the plaintiff. The plaintiff shall have the right to select the court to which the action shall be transferred in the event the action might properly have been filed in more than one court.