# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-01259-COA

**JASON C. LUCAS**                                                                    **APPELLANT**

**v.**

**THE ESTATE OF MARY E. LUCAS, BY AND**                          **APPELLEES**
**THROUGH AMY T. REYNA, EXECUTRIX, AMY**
**T. REYNA, INDIVIDUALLY AND HARRY S.**
**LUCAS, INDIVIDUALLY**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/07/2024 |
| TRIAL JUDGE: | HON. MICHAEL CHADWICK SMITH |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JANSEN TOSH OWEN |
| ATTORNEY FOR APPELLEES: | NATHAN S. FARMER |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 12/16/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A mother drafted a will devising her home to her children. After one son moved in with her as her caregiver, she gifted him the house by quitclaim deed. She and her other children subsequently petitioned to have this gift set aside as the result of undue influence. The chancery court declared the gift invalid and set aside the deed. The son appeals. Finding no error, we affirm.

## BACKGROUND

¶2.     Mary Lucas and her husband Harold had six children.  In 2015, Harold passed away. Following his death, Mary had an attorney prepare her will. The will explained that she had

five living children and one child who predeceased her (whose 1/6 share she instructed be equally divided among his four children).

¶3. Mary's will specifically devised the profits from the sale of her home to her children and grandchildren: "I direct that my residence at 247 Lake Side Drive, Carrier, Mississippi, be sold and the proceeds be divided into 1/6th shares and so divided among my children."

¶4. After her husband's death, Mary remained in the home by herself. However, in the years following the execution of her will, she began experiencing heart-related health issues As a result of her declining physical health, she became increasingly dependent on those around her. She also had a traumatizing event during which she lost control of her car and ended up in the wrong lane of traffic. Although the cause was unclear, Mary chose to stop driving and relied on others for transportation.

¶5. Following the incident behind the wheel, Mary's son Jason moved in to help her. His primary role was to assist with her appointments, take her grocery shopping, and manage the everyday needs of her household. To accomplish this plan, Mary signed a durable power of attorney to Jason in 2017. Around the same time she signed the POA, Mary added Jason as a co-owner on her bank accounts.

¶6. In contradiction of the terms of her will, in 2019, Mary signed a quitclaim deed transferring ownership of her house to Jason. In the ensuing months, he sold his former home.

¶7. In late March 2022, four years into her living arrangement with Jason, Mary called for help from one of her other sons, Harry, who lived not far away in Picayune. She told Harry

2

she was concerned Jason was trying to cut off her phone. She also later claimed her checkbook was missing. Harry would subsequently testify that when he came to the house to help his mother, he did not speak to Jason—because "[h]e was elusive and stayed behind" a "locked door" in the house.

¶8.     At some point, Harry relayed his concerns to his sister Amy, who lived in Texas. Harry and Amy then began to intervene and help their mother with her healthcare. Shortly afterward, Mary revoked the power of attorney she had granted to Jason.

## PROCEDURAL HISTORY

¶9.     A few months later, a lawsuit was filed on behalf of Mary "by and through" her daughter Amy and son Harry against Jason. In relevant part, the complaint alleged that Jason had a "confidential relationship" with his mother and improperly "took advantage" of Mary, resulting in her quitclaiming the family home to him. Accordingly, the requested relief was to "set[] aside and vacat[e] any and all deeds" or "inter vivos transactions" between her and Jason.

¶10.    The following month, Mary passed away in the hospital, just days after her 90th birthday. Amy sought probate of Mary's will to distribute the 1/6 interest in the home to each of the children.

¶11.    The suit to set aside the quitclaim deed to Jason proceeded to trial. Just three witnesses were called: Jason, Harry, and Amy. Jason did not dispute that he had a power of attorney for his mother, or that he had received financial benefits during his time as her caregiver—such as receiving the proceeds of a $6,000 "signature loan" she had obtained.

3

¶12. But Jason disputed that he had secreted his mother away from the rest of the family. Indeed, Amy testified that she learned about the quitclaim of the house in "January 2020," a little over 2 years before the petition to set it aside was filed. She testified, "I found out when my daughter went to visit," adding that "[e]ither Jason . . . or my mama . . . told her about it when she was there" for a visit. While Amy stated she "was upset, and . . . disappointed," and even "concerned for [her] mother's welfare" because of the house transfer, she admittedly took no action at the time.

¶13. The trial court issued a multi-page order sifting through the claims and defenses of the children. As a threshold matter, the trial court found that "all of the factors to prove the existence of a confidential relationship have been met and are undisputed."

> Jason had a close relationship with Mary, who was his mother. Mary required constant care, which Jason provided when he moved in with her. Jason provided transportation for Mary when she received medical care. Jason had a joint bank account with Mary. Mary was physically weak, at an advanced age of over 80 years old, and had poor health due to heart issues. Finally, Mary executed a power of attorney naming Jason as her agent.

Accordingly, the trial court determined that there was "a presumption of undue influence" in the transfer of the house.

¶14. Next, the trial court assessed whether Jason had any evidence to counteract the presumption since, in the court's words, "the burden of proof shifts to the defendant to show by clear and convincing evidence that the gift (or any other transaction at issue) was not the product of undue influence." The trial court's order found "that Mary was mentally sharp during the times in question," which acted in Jason's favor. But other facts that could be mustered to defeat the presumption were slim, which was exacerbated by Jason's failure to

4

bring forth any disinterested witnesses in support of his defense. In the end, the trial court determined "that the quitclaim deed was the result of undue influence and therefore set[] aside and vacate[d] the quitclaim deed[.]"

¶15. Jason appealed, and the appeal was deflected to us for review.

## DISCUSSION

¶16. On appeal, Jason does not dispute that a confidential relationship existed between him and his mother at the time the deed was signed. Nor does he dispute that the presumption of undue influence was raised. Instead, he makes one argument: that the trial court "erred when it found that Defendant, Jason C. Lucas, had not rebutted the presumption of undue influence."

¶17. Since the first two critical findings are conceded, the sole inquiry for this Court is whether Jason provided sufficient evidence to rebut the presumption.

¶18. Our standard of review is extremely limited in such a situation. We "will not disturb a chancery court's findings of fact when there is substantial evidence in the record to support the court's findings, unless the findings are clearly erroneous or manifestly wrong, or the chancery court abused its discretion." *Weirich v. Murchison*, 200 So. 3d 1085, 1089 (¶9) (Miss. Ct. App. 2016).

¶19. Crucially, the rebuttal burden faced in this type of case is extremely high. "If a confidential relationship exists between the grantor and the grantee, the grantee must overcome the presumption of undue influence by clear and convincing evidence." *Id.* at 1090 (¶11). This is a formidable challenge at trial and even more arduous on appeal:

5

"Clear and convincing evidence is such a high evidentiary standard that it surpasses even the standard of overwhelming weight of the evidence." *Miss. Comm'n on Judicial Performance v. Shoemake*, 191 So. 3d 1211, 1218 (¶26) (Miss. 2016) (quotation marks omitted). As an appellate court, we must "bear in mind" this high standard in determining whether there is sufficient evidence to support the chancellor's findings. *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987). "Where the appealing party has such a burden at trial, he necessarily has a higher hill to climb on appeal . . . ." *Id*.

*Matthews v. Whitney Bank*, 282 So. 3d 786, 794 (¶29) (Miss. Ct. App. 2019).

¶20. Our Supreme Court has further clarified that Jason, as the person attempting to preserve the quitclaim deed, may not rely on his testimony alone to meet this burden. "This Court has previously found that the testimony of the proponents or interested parties is *not sufficient* to rebut the presumption of undue influence." *In re Est. of Holmes*, 961 So. 2d 674, 681 (¶19) (Miss. 2007) (emphasis added); *see also In re Est. of Autry*, 407 So. 3d 200, 205 (¶14) (Miss. 2025) (finding that once a confidential relationship was established, meeting the rebuttal burden required more than just the testimony of the proponent since that "testimony is insufficient to rebut this presumption").

¶21. In contrast to these established standards, Jason's argument on appeal effectively urges us to reweigh the evidence presented to the trial court. He contends Mary had the mental capacity to transfer the house to him and that while "he did not tell his siblings about the deed," "he did not believe he should have told them." He also emphasizes that although he personally was not forthcoming about the inter vivos transfer of the house, his sister Amy learned of the quitclaim deed over 2 years before she intervened. He further draws our attention to the fact that he provided $10 to his mother in consideration for ownership of the house.

6

¶22.    However, despite Jason's efforts, this is not the standard. First, our deferential standard of review forecloses reweighing the evidence in this case. Second, our case precedent is clear that Jason may not rely on his testimony alone to meet the rebuttal burden. As set out above, only three witnesses testified at trial—Jason, who was the defendant, and Harry and Amy, who were the petitioners. None of these three was a disinterested witness. Jason cannot cobble together the proof sufficient to meet his rebuttal burden without a disinterested witness.

¶23.    The high rebuttal burden acts as a safeguard to those who may be vulnerable in our society. Our Supreme Court has declared that the Judiciary has the "solemn" duty "to prevent undue influence from being exerted by the dominant party to a confidential relation on the party dependent upon him." *Est. of McRae*, 522 So. 2d 731, 740 (Miss. 1988).

> This is why the law declares that when there is a fiduciary or confidential relation, and there is a gift or conveyance of dubious consideration from the subservient to the dominant party, it is *presumed* void. This is not because it is certain the transaction was unfair; to the contrary, it is because the Court *cannot be certain it was fair*.

*Id*. at 737.

¶24.    In the trial below, Jason presented zero proof beyond his own testimony that the transfer of his mother's home to him via quitclaim deed was free of undue influence. This is what was required of him and what he had to show in order to overcome the presumption long established by our caselaw. The trial court found that he failed to meet his burden, and we find no error.

¶25.    **AFFIRMED.**

7

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**