583 So.2d 1259 (1991)
Romeo VEGA and Martha Vega
v.
ESTATE OF Martha D. MULLEN.
No. 07-CA-59600.
Supreme Court of Mississippi.
March 20, 1991.
Rehearing Denied September 4, 1991.
James R. Hayden, Hattiesburg, for appellants.
Samuel E. Farris, Hattiesburg, for appellee.
Before HAWKINS, P.J., and ROBERTSON and BANKS, JJ.
BANKS, Justice, for the Court:

INTRODUCTION
Romeo and Martha Vega appeal from a judgment of the Chancery Court of Forrest County canceling a deed in their favor. At *1260 issue are questions of undue influence and failure of consideration. Concluding that the challenged judgment is the result of manifest error as to undue influence and failure of consideration, we reverse and remand for further consideration of the issue of damages. Subsequent to the final entry of judgment below, Martha D. Mullen died. Pursuant to his request, Samuel E. Farris, Executor of Mrs. Mullen's estate, has been substituted as a party in her place.

FACTS
Plaintiff-Appellee Martha D. Mullen was an eighty-eight (88) year old widow at the time of the trial and eighty-six (86) at the time she executed the deed in question. She was the mother of three children, Mrs. Mildred Dunn, Mrs. Emily Puclyouski, and Mr. T.A. Kyle. (Mr. Kyle died three months prior to the filing of the Complaint to Cancel the Deed.) Prior to March 17, 1986, Mrs. Mullen was the sole owner of a house and two (2) acres of land valued at approximately sixty thousand dollars ($60,000.00). Although it is not legally relevant, it is interesting that the land was given to Mrs. Mullen by Martha Vega.
Defendant-Appellant Martha Vega is the wife of co-appellant Romeo Vega, the granddaughter of Martha Mullen, and the daughter of Mildred Dunn.
In addition to suffering the normal ravages of age, Mrs. Mullen suffered numerous afflictions including hearing and sight impairments, heart problems, diabetes, arteriosclerosis, and arthritis. She was dependent on the aid of a walker but remained in a wheelchair most of the time. In August 1984, a stroke hospitalized Mrs. Mullen for approximately three (3) weeks. Although there was no paralysis, because of her physical infirmities, it was no longer feasible for her to live in her home alone. Mrs. Mullen continued to manage her own personal financial affairs, including maintaining bank accounts and paying bills.
Her children were advancing in age and of poor health as well, but each shared the responsibility of caring for Mrs. Mullen. According to testimony, Mrs. Mullen was difficult to care for and difficult to please. She lived with her elder daughter Mrs. Dunn until Mrs. Dunn's second daughter moved from home because the daughter could no longer take her grandmother's verbal abuse. Because Mrs. Dunn was unable to care for her mother alone, Mrs. Mullen moved to Mrs. Puclyouski's home.
Testimony indicates that Mrs. Mullen had been at her younger daughter's home only a few months when she began expressing unhappiness and displeasure at being there. Mrs. Beverly Williamson, the nurses aid who had been attending Mrs. Mullen three (3) times a week and who was still Mrs. Mullen's aid at the time of trial, testified that Mrs. Mullen expressed her unhappiness. Mrs. Williamson added that there was evidence that the only baths Mrs. Mullen received were those she received on Mrs. Williamson's visits. There were questions about whether Mrs. Puclyouski fed her mother properly and there was testimony that Mrs. Puclyouski did not allow her mother to watch television.
Mrs. Mullen testified that she was not dissatisfied living with Mrs. Puclyouski. She disputed that she called Mrs. Vega and asked to go home as indicated by Mrs. Vega and added that it was at Mrs. Vega's urging that she left her daughter's to return to her home.
In any event, it is undisputed that in October 1985, Mrs. Vega offered to have the utilities turned back on at her grandmother's house which had been vacant for sometime, to leave her home, and to take her grandmother from Mrs. Puclyouski's to Mrs. Mullen's home for a two week vacation. Mrs. Vega, her husband and her son lived in Purvis where they owned a doublewide mobile home and sixty (60) acres of land on which they raised horses for sale. Mrs. Vega left her family and her business to stay with Mrs. Mullen for what was intended to be a two-week vacation for Mrs. Mullen as well as her aunt Mrs. Puclyouski. When the two-week period expired, Mrs. Mullen did not want to return to her daughter's. Upon her grandmother's insistence Mrs. Vega joined by her husband remained with Mrs. Mullen in her *1261 home. The Vegas left their son in Purvis to attend to the horses.
Mrs. Vega testified that she bathed Mrs. Mullen daily, prepared all of her meals, picked up her medicine, and monitored her constantly. On numerous occasions the Vegas attempted to leave and return home, but on the insistence of the family and Mrs. Mullen, they remained in Mrs. Mullen's home and continued to care for her. Mrs. Mullen testified to the contrary suggesting that Mrs. Vega failed to feed her properly and verbally abused her.
Three (3) months after Mrs. Vega began caring for her grandmother, the Vegas sold their horse farm. Mrs. Vega sold her small car and bought a larger car in which Mrs. Mullen would be more comfortable. The relationship between Mrs. Vega and her grandmother continued to deteriorate, however, and shortly after the sale of the farm, the Vegas wanted to leave again. They went as far as to rent a house but were stopped from moving by Mrs. Dunn and Mrs. Puclyouski. According to testimony by both Mrs. Vega and Mrs. Mullen, in an attempt to stay under her granddaughter's care, Mrs. Mullen told Mrs. Vega, who was characterized by Mrs. Mullen and other family members as Mrs. Mullen's favorite granddaughter, "let me make you a will to my property and you take care of me."
Early in March 1986, Mrs. Mullen requested Glenn White, an attorney whom she considered to be her lawyer, to come to her house to talk with her about preparing a will. Mr. White was then the District Attorney and was not engaged in the practice of law. He brought Jeff Stewart, a practicing lawyer, to Mrs. Mullen's home. Mr. Stewart was instructed to prepare the proposed will as directed by Mrs. Mullen, leaving the house and real property to Mr. and Mrs. Vega and dividing her personal property among her children. He was to return with the prepared will when called by Mrs. Mullen. He prepared the will but was never called by Mrs. Mullen. At the time of trial, the will had never been executed.
Approximately one week after Mr. White and Mr. Stewart visited with Mrs. Mullen in her home, Mr. Kyle came from Louisiana to meet with his mother and his sisters to determine the future care of Mrs. Mullen. She had become so unbearable that the Vegas wanted to leave again. Mrs. Mullen testified that the four of them met alone in her home on Sunday, March 16, 1986. She and her children discussed her condition and the undesirable possibility of putting her in a convalescent home. Neither of the Vegas was present during this meeting.
Upon the suggestion of Mr. Kyle, Mrs. Mullen and her family agreed that Mrs. Mullen would deed her property to the Vega's reserving a life estate therein in exchange for their continued care of her and continued maintenance of the property. This agreement was reduced to a writing signed by Mrs. Mullen and each of her children. It is as follows:
I, Martha D. Mullen do hereby deed this property to Romeo & Martha Vega. That this is my home that they will take care of me as long as I live. They will pay the bills and up keep of this property and pay all the bills (light bill, water bills, Grocery bills etc. that I just pay for my doc bills & medicine. Any time they don't want to take care of me this deed is null & void. The children are here and signing this to make sure that this is carried out. (Errors in the original.)
The next day, Monday, March 17, 1986, was Mrs. Dunn's birthday. Mrs. Vega testified that she suggested that Mrs. Dunn, Mrs. Mullen and she go for a steak. She testified that Mrs. Mullen requested that while they were out that they also see an attorney to draft the deed discussed the previous evening. Because she would be in her wheelchair, Mrs. Mullen asked that Mrs. Vega find an attorney that would be easily accessible to her.
Mrs. Mullen, Mrs. Dunn and Mrs. Vega went to the office of William (Billy) Andrews, III, an attorney in Purvis, Mississippi. Mrs. Vega testified that James Cook of Hattiesburg was her regular attorney and that the only prior dealing she had had with Mr. Andrews arose with regard to the selling of their farm. Mr. Andrews represented *1262 the doctor who purchased the farm. Neither Mrs. Dunn nor Mrs. Mullen had any prior dealings with Mr. Andrews. She indicated that she chose Andrews because of the accessibility of his office to a wheelchair.
Mr. Andrews testified that Mrs. Mullen, Mrs. Dunn and Mrs. Vega came into his office to have a deed drafted. After receiving the document that contained Mrs. Mullen's desires and wishes, Mr. Andrews stated that Mrs. Mullen reiterated that she wanted a deed transferring her property to the Vega's reserving a life estate and providing that they take care of her and maintain the property.
Because Mrs. Vega was not Mrs. Mullen's daughter, Mr. Andrews indicated that he discussed in detail her wishes and explained the difference in a will and a deed. Additionally, he took notes of the meeting which were introduced into evidence. At no time during the discussion did he detect health problems that impaired Mrs. Mullen's decision-making capacity, nor did Mrs. Mullen ever mention that she had asked Mr. Stewart to draft a will.
Mrs. Mullen told Mr. Andrews that she had discussed the deed with her children, prayed about it, and decided that executing the deed was what she wanted to do. His professional opinion was that Mrs. Mullen knew exactly what she was doing at the time she executed the deed. Though Mrs. Dunn and Mrs. Vega accompanied Mrs. Mullen, no one but Mrs. Mullen and Mr. Andrews were in his office during the discussions.
Mrs. Mullen stated in her testimony that she understood the arrangement with her granddaughter to be contractual. Contradicting the testimony of Mr. Andrews, Mrs. Mullen testified that she did not understand what she was doing at the time and suggested that it was because of her failing health, generally, and her sight impairment specifically. Mrs. Mullen added that she executed the deed because it was what Mrs. Vega wanted.
Approximately one year later, Mr. Kyle died. During his funeral, Mrs. Dunn became ill and required hospitalization. Because there was no one to stay with her mother, Mrs. Vega took Mrs. Mullen to Mrs. Puclyouski's until Mrs. Dunn would be released from the hospital. Mrs. Vega testified that she intended to take her mother back to Mrs. Mullen's home where she would care for both her mother and her grandmother and that she had an additional bed set up in the house for her mother. Mrs. Dunn corroborated this testimony.
When the hospital released Mrs. Dunn, Mrs. Vega took her mother to Mrs. Mullen's home. It was at that juncture that the Vegas began driving a tractor trailer for a living. There is a sharp dispute over whether Mrs. Vega reneged on her agreement to care for Mrs. Mullen or whether Mrs. Mullen simply refused her care. Mrs. Vega testified that, although she left, she continued to pay all of the bills and provide for the upkeep of the house. She stated that they left their twenty-two (22) year old son at home to help Mrs. Dunn and to help with Mrs. Mullen, if she ever returned.
Mrs. Mullen claimed that the Vegas had begun a pattern of verbal abuse after they received the deed in question. She described an altercation with Romeo and Martha Vega in which she was pushed down. Martha's version was that Mrs. Mullen was verbally abusive, became upset and when she was restrained from leaving the house for her own safety, she pushed Mrs. Vega down with her walker. Mrs. Mullen denied any verbal abuse. An independent witness testified that the Vegas treated Mrs. Mullen very well and any mistreatment that she observed was at the hands of Mrs. Puclyouski. That witness, Mrs. Williamson, also testified that Mrs. Mullen had offered to make it worth her while if she would support Mrs. Mullen at the trial.
The relationship deteriorated between Mrs. Mullen and the Vegas, however, it is clear that Mrs. Mullen refused to return to the home after she left during Mrs. Dunn's surgery. Mrs. Dunn remained in the house for seven (7) months until she bought a mobile home and moved next door to the house. The Vega's son noticed, thereafter, that some of the personal belongings in the house were disappearing and asked his parents *1263 what should be done. The Vegas instructed their son to change the locks on the doors. According to her testimony, the purpose of changing the locks was not to keep Mrs. Mullen out, but to keep the house intact as she had left it. Mrs. Mullen's testimony indicated that she could not have entered the house had she wanted because of the changed locks.
In August 1987 Mrs. Mullen filed a Complaint to Cancel the Deed. In her complaint Mrs. Mullen alleged (1) that at the time of the execution of the deed she was physically and mentally incapable of understanding her act;[1] (2) that a fiduciary relationship existed between her and the Vegas and that the deed was a product of undue influence; (3) that the Vegas committed fraud upon her by inducing her to execute the deed by false promises to take care of her for the remainder of her life and to maintain the property; and (4) that the deed was without consideration.

ISSUES

Scope of Review.
This Court must accept the Chancellor's findings of fact "where they are supported by substantial credible evidence in the record." Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987) (citing Anderson v. Burt, 507 So.2d 32, 36 (Miss. 1987); Norris v. Norris, 498 So.2d 809, 814 (Miss. 1986); Gilchrist Machinery Co., Inc. v. Ross, 493 So.2d 1288, 1292 (Miss. 1986); Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983); Culbreath v. Johnson, 427 So.2d 705, 707-09 (Miss. 1983); Richardson v. Riley, 355 So.2d 667, 668 (Miss. 1978)).
After reviewing the entire record if substantial evidence does not support the assertion that the Chancellor's findings were manifestly wrong, this Court is bound to affirm the trial decision. Holliman v. Charles L. Cherry & Assocs., Inc., 569 So.2d 1139 (Miss. 1990); Walters v. Patterson, 531 So.2d 581 (Miss. 1987); Brown v. Williams, 504 So.2d 1188, 1192 (Miss. 1987); Harkins v. Fletcher, 499 So.2d 773, 775 (Miss. 1986); Dillon v. Dillon, 498 So.2d 328, 329 (Miss. 1986); Country Club of Jackson v. Saucier, 498 So.2d 337 (Miss. 1986).

I. THE CHANCELLOR WAS MANIFESTLY WRONG IN SETTING ASIDE THE WARRANTY DEED DUE TO THE FAILURE OF ROMEO AND MARTHA VEGA IN OVERCOMING THE BURDEN OF PRESUMPTION OF UNDUE INFLUENCE.
The parties do not dispute that a fiduciary or confidential relationship existed between the Appellee, Martha Mullen, and the Appellants, Romeo and Martha Vega. The law in Mississippi is clear that the existence of such a fiduciary or confidential relationship gives rise to the presumption of undue influence; therefore, the Vegas, as the proponents of the deed, were required to overcome the presumption by clear and convincing evidence. Miner v. Bertasi, 530 So.2d 168, 170 (Miss. 1988); Ham v. Ham, 146 Miss. 161, 110 So. 583, 584 (1926); Meek v. Perry, 36 Miss. 190, 250 (1858).
This case is governed by this court's prior pronouncements and in Mullins, supra, and Murray v. Laird, 446 So.2d 575 (Miss. 1984). What is necessary to overcome a presumption of undue influence when the circumstances give rise to such is evidence of:
(1) good faith on the part of the grantee/beneficiary;
(2) grantor's full knowledge and deliberation of his actions and their consequences; and

*1264 (3) grantor's independent consent and action.
The key to this case is that since Murray, the Court has made the test less rigid and modified the third factor by eliminating the requirement that the donor receive advice from an independent competent person. Mullins v. Ratcliff, 515 So.2d 1183, 1193 (Miss. 1987). Now, rather than requiring the independent advice of a competent person, the Court requires a showing of the grantor's "independent consent and action" based on all of the surrounding facts and circumstances.
The Chancellor placed great emphasis on the fact that Attorney Andrews was not selected by Mullen and had had prior dealings with the Vegas. In the view of the lower court, the Vegas could not overcome the presumption of undue influence because Andrews was not shown to have been independent. That view is erroneous because we modified the independent advice requirement in Mullins and adopted a more flexible approach. We must, then, examine the evidence in light of that approach.
According to the record, the substantial weight of evidence satisfies the good faith requirement. Testimony was undisputed that Mrs. Mullen, along with her three children, initiated seeking preparation of the deed on March 16, 1986. Prior to March 16, when Mrs. Mullen met with her children, she had already initiated solely on her own the drafting of a will in which the property in question was to be left to Mrs. Vega. On March 16 she and her children discussed their alternatives determining that the most favorable option was to deed the property to Mrs. Vega, reserving a life estate for Mrs. Mullen. In exchange Mrs. Vega would care for her grandmother and maintain the property. Mrs. Vega was not present during this discussion.
The instrument was executed at the office of attorney William Andrews, III. Although Mrs. Vega and Mrs. Dunn accompanied Mrs. Mullen to his office, she was left alone with Mr. Andrews to discuss the deed. Mr. Andrews testified that he received thirty-five dollars ($35.00) for drafting the deed, but his receipt did not note which party actually paid for the service. Testimony also supported the openness given the execution of the instrument. There were no secret deliberations or any covert activity. Mrs. Mullen and her children planned and agreed to the deed. There was full disclosure prior to the execution of the instrument.
Likewise, the second element, "grantor's full knowledge and deliberation of his actions and their consequences," is satisfied by overwhelming evidence. Mrs. Mullen remained in complete control of her finances at all times. According to testimony, she maintained her own bank accounts and paid her own medical bills. These facts are undisputed. In fact, the approximate value of the property in question was based on Mrs. Mullen's own estimate.
There is no evidence to indicate that Mrs. Mullen did not understand who her heirs were. In the will she asked Mr. Stewart to draft, she left her real property to Mrs. Vega and the contents of her home, her personal property, to be divided among her children. The deed left the will predominantly unchanged. There were no non-relative beneficiaries mentioned at any time during the proceedings. Thus, a reasonable inference could be drawn that there were no non-relative beneficiaries to be included. Finally, Mrs. Mullen knew who controlled her finances  she did.
The last factor is the main issue involved in this appeal. Whether there is a showing "by clear and convincing evidence that the grantor/testator exhibited independent consent and action." Mullins v. Ratcliff, 515 So.2d at 1193. In Mullins, the Court affirmed a valid inter vivos gift from the grantor, holding the proponent overcame presumption of undue influence. The grantor had expressed his intent to convey the property to the grantees in repayment for their taking care of him two years prior to the drafting of the deed. There was also testimony that the grantor knew what he was doing on the day he executed the deed. This Court held that was sufficient to establish his independent consent. Id. at 1195-96.
*1265 In this case, it is undisputed that Mrs. Mullen expressed her intent to convey the property to Mrs. Vega several weeks prior to the execution of the deed. When Mr. White and Mr. Stewart came to her home to discuss the drafting of her will, Mrs. Mullen expressed her intentions to everyone present. Most importantly, all of Mrs. Mullen's children, her natural beneficiaries, discussed the proposed action with her and agreed to it. Additionally, Mr. Andrews testified that on March 17, 1986, when the deed was executed, Mrs. Mullen knew what she was doing. She told him she had discussed it with her family, had prayed about it and was sure that she wanted to execute the deed. Mr. Andrews also testified that he took great pains in explaining the difference in a will and a deed so that there would be no mistakes. The evidence overwhelmingly supports the Vega's rebuttal of the presumption of undue influence.
Again, in Mullins, the Court refers to the three-pronged test and concludes that these
prongs should not be understood as entirely separate and independent requirements that ought be rigidly exacted in every case. Undue influence is a practical, non-technical conception, a common sense notion of human behavior ... common sense counsels against rigid, inflexible multi-part tests, particularly as the parties our law saddles with proof of the negatives are laymen, not legal technicians.
Id. at 1194. Applying this reasoning, it appears clear that the overwhelming weight of evidence viewed in its entirety rebuts the presumption of undue influence. For the foregoing reasons we find merit in this assignment of error.

II. THE CHANCELLOR WAS MANIFESTLY WRONG IN SETTING ASIDE THE WARRANTY DEED DUE TO LACK OF CONSIDERATION.
The Warranty Deed reads
[g]rantors [sic] herein reserves and excepts unto herself a life estate in and to the above described property. The Grantees [Romeo and Martha Vega] herein agree to care for the Grantor [Mrs. Mullen] herein and maintain and pay the upkeep on the home located on the property conveyed herein during the life of the Grantor.
The Vegas contend that the remedy for failure to support as recited in the deed, if such exists, is a suit for damages for breach of the agreement to support and not cancellation of the deed. Mississippi case-law agrees.
It is well settled that the failure of a grantee to perform a contractual obligation in a deed to support and maintain the grantor does not invalidate a voluntary conveyance, but would give rise to an action for damages caused by the alleged breach of the obligation. Leggett v. Graham, 218 So.2d 892, 894-95 (Miss. 1969); Old Ladies Home Ass'n v. Platt, 252 Miss. 260, 172 So.2d 770 (1965); Olmstead v. Olmstead, 233 Miss. 621, 103 So.2d 399, 401-02 (1958); Wilson v. Combs, 203 Miss. 286, 33 So.2d 830, 831 (1948). See also Covington v. Butler, 242 So.2d 444, 446-47 (Miss. 1970).
The Chancellor erred in his determination that even if the deed were valid, absent any undue influence, it must be set aside for failure of consideration. Clearly, the Vegas undertook the obligation to support and maintain Mrs. Mullen and to maintain the property. If there is any failure of consideration at all, the result is to be addressed by awarding damages, the alternative relief for which Mrs. Mullen prayed, rather than a cancellation of the deed. It is at least arguable, that the Chancellor found that the Vegas ceased to perform their contractual duty of care in February 1988 when they went on the road. We cannot say that such a finding, if made, was clearly erroneous. We must, therefore, remand for further consideration of that issue and the assessment of damages, if necessary.

CONCLUSION
For the foregoing reasons we reverse the judgment entered by the Chancery Court and remand this matter to that court for further findings as to whether there has *1266 been a breach of contract and, if so, what damages, if any, were proven.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.

ON PETITION FOR REHEARING
HAWKINS, Presiding Justice, dissenting:
I would grant the petition, and I respectfully dissent.
The petition for rehearing justifiably takes the Court to task for its bias and misreading of the record. The majority opinion does a hatchet job on Mrs. Mullen, one illustration being its telling us that "she was hard to please," and one granddaughter (not Martha Vega) left because "she could no longer take her grandmother's abuse." (Majority Opinion, p. 1260) This latter statement is an irrelevant, gratuitous assertion from Martha, based upon hearsay, and even if true, had nothing to do with any of the facts of this case. As for her being difficult and hard to please, this also comes solely from Martha Vega. By the way, is an 86-year-old lady in arthritic pain, paralyzed with a stroke, diabetic, almost blind and virtually deaf, supposed to be easy to please?
As to Martha Vega, her conduct is, if not justified  the majority cannot do that  at least softened. This lady, who had traded with her grandmother to live in her home with her until she died and look after her in return for the house and two-acre lot, deposited "Granny" with Aunt Emma Lee, and took off to Florida with her husband. It did not occur to her that she then had a duty to deed the property back to Mrs. Mullen. The majority tells us there "is a sharp dispute over whether Mrs. Vega reneged on her agreement to care for Mrs. Mullen." Why? "Mrs. Vega testified, that, although she left, she continued to pay all of the bills and provide for the upkeep of the house." (Majority Opinion, p. 1262) Some help.
None of these statements by the majority serves any purpose except to make us like Martha and not think much of Mrs. Mullen. Moreover, they are a one-sided reading of the record, depending entirely on the testimony of Martha Vega.
As will be shown below, the majority is simply incorrect in stating that "Mrs. Mullen, along with her three children, initiated seeking preparation of the deed on March 16, 1986," and further stating that "she and her children" determined "to deed the property to Mrs. Vega." (Emphasis added) (Majority Opinion, p. 1264)
Mrs. Mullen wanted a will, and that is what her lawyer had drafted and that is what would have been executed had she been left alone. Her three children wanted a deed to Martha and Romeo Vega, but with a proviso, "Any time they don't want to take care of me this deed is null and void." Martha wanted a deed without that safeguard for Mrs. Mullen. What Martha wanted, Martha got.
Counsel reminds us in his petition:
Clearly, it is society and the courts who must take care of our elderly in this world. If we do not protect them from being taken advantage of because of their age and poor health then who will? All too often, and as is the case presently before this Court, the Court must protect the elderly from even their own family members. If the Court does not perform this obligation then who will protect them? Clearly, this decision has tied the hands of the outstanding Chancellors in this state in the performance of their duties to protect such elderly individuals as Mrs. Mullen.
(Petition for rehearing brief, p. 2)
In this case we have the extraordinary circumstance, to which the majority curiously attaches no significance, that Mrs. Mildred Dunn, Martha Lee's own mother, made a telling witness against her.
The majority has lent this Court's "assistance to fraud."

*1267 FACTS

THE FAMILY
Mrs. Martha D. Mullen was born in Belgium on December 13, 1899. During World War I she met and married Tom Kyle, a Mississippi soldier, and they came to his home in this state to live. They had three children: Mildred, born March 17, 1920; Emma Lee, born in 1922; and Thomas Archie.[1]
Mr. Kyle died in 1933, and Mrs. Mullen remarried and moved to Forrest County. Mildred married Lee Dunn, and they had two children, Martha Lee and Carolyn. Martha Lee Dunn married Romeo Vega, and they had a son named Raymond.
Emma Lee, or "Emily," married a man named Puclyouski.

CHRONOLOGY
In 1960 Mrs. Mullen acquired two acres in the Dixie community of Forrest County and constructed a brick residence on the property.
In 1983 or 1984 Mrs. Mullen went to live with Mildred. Mrs. Mullen was hospitalized in April, 1984, with a fractured coccyx and respiratory infection. In August, 1984, she suffered a stroke and was again hospitalized for three weeks. The stroke disabled her with a very weak left arm and leg. At the time she suffered the stroke, Mrs. Mullen also had diabetes, disabling arthritis and congestive heart failure. She had cataracts in both eyes. Her physician testified:
She was an elderly lady even before the stroke, but then after the August of '84 stroke and the weakness in her left arm and leg, she acquired both canes and walkers and wheelchairs. She was a pretty decrepit old lady.
Dr. Nollie C. Felts, Jr., deposition, p. 8.
Mildred, who in turn was a diabetic and crippled following double hip surgery, took Mrs. Mullen to Emma Lee's home in 1985. Emma Lee also was in poor health.
In October, 1985, Martha Lee, who was Mrs. Mullen's favorite grandchild, thought that she could give Mrs. Mullen better treatment, and she would be happier if Mrs. Mullen returned to her own home, and Martha Lee and Romeo lived with her and looked after her. This was in accord with Mrs. Mullen's wishes as well, who told Martha Lee that if she would come and live with her, she would will her the property.
The Vegas thereupon that month set up housekeeping in Mrs. Mullen's residence, looking after Mrs. Mullen. Romeo was employed at a local industry. Raymond, 22 years of age and single, also subsequently moved into the home.
In early 1986, Mrs. Mullen contacted Glenn White, an attorney she knew in Hattiesburg, to prepare a will for her. White was district attorney at the time and prohibited from practicing law. He did, however, take Jefferson (Jeff) Stewart, another Hattiesburg attorney, to Mrs. Mullen's home where she gave them instructions as to her will. Following this, Stewart returned to his office and prepared a proposed will for her to execute. The proposed will, never executed because of subsequent events to be noted below, devised all the realty to Martha Lee, bequeathed all the furniture in the home to "Emma Lee Puclyouski and Mildred Maye Dunn," and bequeathed all bank savings to "Thomas Archie Kyle, Emma Lee Puclyouski and Mildred Maye Dunn." The will made a special bequest of "the wash bowl and pitcher on my living room table" to Martha Lee. Paragraph 5 states: "I nominate as executor of my estate, my grandson, Frankie Puclyouski."
On March 16, 1986, there was a meeting at Mrs. Mullen's home between Mildred, Emma Lee and T.A. Kyle, who had come from his home in Baton Rouge. The son thought that a will was not the thing for his mother to execute, that it could be broken. Thereupon Mildred in her handwriting wrote, and the three of them signed the following:
 March 16, 1986
 Hattiesburg, Ms.

*1268 I Martha D. Mullen do hereby deed this property
to Romeo and Martha Vega. That this is my home that they will take care of me as long as I live. They will pay the bills and up keep of this property and pay all the bills (light bill, water bills, Grocery bills, etc.) that I just pay for my doc bills & medicine. Any time they don't want to take care of me this deed is null and void.
The children are here and signing this to make sure that this is carried out.
/s/ Mildred K. Dunn /s/ T.A. Kyle
/s/ Emma Lee Pucylouski
At some subsequent time, either that night or the next day, Mrs. Mullen signed her name "Martha Mullen" in the top left corner.
The next day, March 17, 1986, Martha Lee on her own initiative took Mrs. Mullen and Mildred to the office of William E. Andrews, III, an attorney in Purvis, who the Vegas knew, and who had given Romeo legal advice upon a previous occasion.
The March 16 document was given Andrews, and following an office conference with them, Andrews prepared and Mrs. Mullen signed a general warranty deed to "Romeo Vega and wife Martha Vega, Grantees, as joint tenants with full rights of survivorship and not as tenants in common," the two acres constituting Mrs. Mullen's homestead. The deed contains the following paragraph:
Grantor herein reserves and excepts unto herself a life estate in and to the above described property. The Grantees herein agree to care for the Grantor herein and maintain and pay the upkeep on the home located on the property conveyed herein during the life of the Grantor.
After the execution of this deed the relationship between the Vegas and Mrs. Mullen deteriorated. It was the contention of Martha Lee that Mrs. Mullen became highly irascible and cantankerous, and of Mrs. Mullen and Mildred that the Vegas were not properly looking after Mrs. Mullen. Also, Mrs. Mullen and Mildred testified that Raymond presented a problem, bringing horses and girl friends to the residence. The mutual animosity resulted in Martha Lee's finally deciding she had taken all she could endure, and in February, 1987, she took Mrs. Mullen to her Aunt Emma Lee's home and left her. Martha Lee and Romeo then moved to Florida where they took a trucking job making long hauls across the United States. Raymond continued to live in the house and changed the locks.
On May 11, 1987, Mrs. Mullen filed a complaint in the Forrest County Chancery Court to set aside the deed on the ground that it was fraudulently procured and was without consideration.
At the February, 1988, trial, the circumstances surrounding Mrs. Mullen's execution of the deed were hotly disputed.
Andrews, who had never seen Mrs. Mullen before March 17, 1986, testified that he thoroughly discussed with her the execution of the deed and that she fully understood what she was doing. His office notes made contemporaneously with the event read:
Ms Mullen 3/17/86 wanted Martha & Roeno [sic] to have place they were going to care for her  & had been. The children of Ms Mullen (3) had signed a written statement to that effect.
We talked a great deal and told me about her decision process  praying
(over)
etc.
I felt she knew exactly what she was doing  She was very specific that she wanted a deed  vs  will  She described exacally [sic] what she wanted.
Andrews testified that he only met with Martha and Mrs. Mullen, there may have been someone else, but he did not recall. The only persons he talked with in his office were these two. He said that the March 16 document was not "written instructions that she gave me," but was something Mrs. Mullen's children had drawn up. His recollection, although he was not positive, was that Mrs. Mullen had paid him $35.00 by check.
When the Vegas were served with process, they went to Andrews to represent *1269 them, and he referred them to the attorney who did represent them at trial.
Andrews never testified whether he talked with Mrs. Mullen privately out of the presence of Martha Lee. Andrews, as notary public, also took Mrs. Mullen's acknowledgement to the deed.
Martha Lee testified that the selection of Andrews was because his office was on the first floor, and not because of her or Romeo's connection with him. She testified that Andrews talked with Mrs. Mullen privately outside of her and her mother's presence.
Mrs. Mullen testified that she did not read the deed because she could not see good. She thought she was signing an agreement, "It's a contract. It's like a contract, you know. I thought I was signing something like a contract." The agreement was that the Vegas were to take care of her. She said that when the lawyer, who she did not know, passed her in his office, she told him at least three times, "If you don't treat me right, it's void." She said he replied, "I understand." She also testified that "Martha wanted me to sign it because she wasn't satisfied with the lawyer that I had already to make a Will." (R. 13-14) She said that Mr. Stewart "was going to make a Will but she wouldn't give Mr. Stewart time to write it up." "She wanted to go to her lawyer." She also testified that Martha Lee and the lawyer left the room, leaving her and Mildred alone.
As to the attorney's explanation, she replied, "He talked to me, but I didn't have nobody, you know. I didn't know  I knew  I felt like it was a contract that I was signing." She said that he read it to her, "But I was too sick to fully understand it. I was sick." She said that she told Martha Lee that she wanted a will. She said that she did not pay Andrews anything for his legal services.
Mildred testified that it was Martha's idea to go to Andrews, that neither she nor her mother knew him. She said that on March 16, 1986, Mrs. Mullen was in bed all day, that she had had a stroke, was a diabetic, had serious ear trouble and cataracts on her eyes. "She can't hear anything, hardly." (R. 78) She testified that on March 17 Mrs. Mullen was not in any physical or mental state to be making a decision as to her property. (R. 82) She also testified that she thought her mother should have had her own lawyer explain to her the effect of the document she was signing. (R. 82) She testified that "it seemed like after the deed or the piece of paper, or whatever that is, a contract or whatever they are trying to call it, was signed, seemed like it was different, you know." Neither her daughter nor her husband Romeo looked after Mrs. Mullen or treated her courteously as before.
Mildred testified that "Mama never could get it in her mind that it was a deed. I tried to tell her and my sister tried to tell her, and I still don't think she  she may know at times, but I really don't think she realized what she did. We like to have never got it over to her to try to tell her what it was, and she still did not listen, I don't think."
Q. What did she tell you about the deed?
A. She said, "Well, if they don't want to take care of me, it's supposed to be null and void," and said, "If Martha Lee would have just come to me and said, `Granny, I'm going to give you your house back, I can't take it no more.'"
She said that Andrews never told Mrs. Mullen that she should have another attorney, or her own attorney, examine the deed. (R. 82) She said that Andrews read the deed over to Mrs. Mullen, but did not explain what she was doing, "but I really and truly don't think she ever did understand it." "She told him if they decided they did not want to take care of her, that this was null and void. She told him that three different times."
Mildred testified that following execution of the deed the Vegas' treatment of her mother deteriorated, and that they did not properly take care of her.
*1270 At trial Martha Lee testified that she was unwilling to deed the property back to Mrs. Mullen.
A day care nurse testified that Mrs. Mullen was properly cared for by Martha Lee, and was treated better there than at Emma Lee's.
Following the hearing, the chancellor rendered an opinion setting aside the deed based upon the confidential relationship between Mrs. Mullen and Martha Lee, and her dependence upon Martha Lee, and the fact that Mrs. Mullen received no independent advice. He also set it aside for lack of consideration. The chancellor's opinion states in pertinent part:
4. About the first part of March 1986 Plaintiff requested Glenn White, an attorney whom she considered "her lawyer," to come to her house to talk with her about preparing a Will. Mr. White, being then the District Attorney and not engaged in law practice, accompanied Jeff Stewart, a practicing attorney in Hattiesburg, to Plaintiff's home, resulting in Mr. Stewart preparing for Plaintiff a proposed Will, Exhibit 4 in evidence. Plaintiff was to call Mr. Stewart to return with the Will, but did not do so prior to her execution of the deed that is herein challenged.
5. On March 16, 1986, Plaintiff's two daughters and her one son met at her home and a discussion was had regarding the disposition of her property for the rest of her life. A handwritten paper regarding that arrangement was produced by someone other than Plaintiff and was signed by the three children. That document recited that "Any time they don't want to take care of me this deed is null and void."
6. On March 17, 1986, Plaintiff, in the company of the Defendant Martha Vega and Plaintiff's daughter Mildred Dunn (who is the mother of Defendant Martha Vega), was carried to the office of an attorney in Purvis, a person who was wholly unknown to Plaintiff prior to the occasion, and who was selected by Defendant. Then and there the deed, Exhibit 1 in evidence, was prepared and executed by Plaintiff. That attorney testified that he discussed with Plaintiff, in detail, the difference between a Will and a deed, that Plaintiff made no mention of a Will having been prepared for her by anyone, that he was made aware of the document handwritten the day before (Exhibit 2 in evidence), that he had not known Plaintiff before that day but that he had known Defendants and on at least one occasion had performed services for them, that Plaintiff was the one who told him that she wanted to deed the property to Defendants reserving a life estate in exchange for Defendants' promise to take care of her and the property for the remainder of her life, that he discussed with Plaintiff what she was doing, and that it was his opinion that she understood what she was doing, and that Defendant Martha Vega paid him for his services.
.....
CONCLUSIONS OF ULTIMATE FACT AND LAW
1. A confidential relationship existed between Plaintiff and Defendants prior to and on March 17, 1986, the date of the execution of deed under attack.
2. Defendants, in view of the confidential relationship, had the burden of overcoming the presumption of undue influence as to the deed by clear and convincing evidence the elements set out by the Mississippi Supreme Court in the case of Murray v. Laird, 446 So.2d 575 (Miss. 1984) as modified by Mullins v. Ratcliff, 515 So.2d 1183 (Miss. 1987).
3. Defendants failed to meet the burden cast upon them as aforesaid. This is not to say, nor infer, anything by way of criticism of the attorney who prepared the deed in question  this Court accepts as absolutely true everything he testified that was said and done by him and that was said to him. Nevertheless, the Court feels that if it is not impossible for one in his circumstance to completely fulfill the requirements of Murray and Mullins, supra, it at the very least approaches very near to the point of impossibility in its degree of difficulty.

*1271 ANALYSIS
The chancellor found that there was a (1) fiduciary relationship which (2) created a presumption of undue influence, and (3) there was insufficient evidence to overcome the presumption. Was he manifestly wrong?
This is the question. There is no challenge to the first two findings above noted. Was he manifestly wrong in finding there was insufficient evidence to overcome the presumption?
In examining these cases, courts should not overlook our two-fold obligation:
1. to honor, respect and, if at all possible, to fulfill the sincere, genuine desire of a grantor or testator; and also
2. to protect the weak, sick and disabled person from imposition by the strong person upon whom he is dependent into making a transfer which, but for the domination of the strong, would never have been made.
Simply put, if the court can be satisfied that the transfer did in fact represent the true, untempered intent of the grantor or testator, we need go no further.
Neither should courts overlook the subtleties of the human character. As we said long ago in Meek v. Perry, 36 Miss. 190, 246 (1858), we should not lend our "assistance to fraud."
It could be well argued in this case that Mrs. Mullen wanted Martha Lee to have the residence at her death, and that is precisely what the deed provided, so where's the problem? What does it matter whether it was by will or deed? What's the difference?
All the difference in the world.
Mrs. Mullen wanted her favorite granddaughter to come to her home and care for her until she died, and, if she did so, Mrs. Mullen wanted her to have the residence after her death. A will was one way of assuring that if for some reason the deal went sour, Mrs. Mullen would not have to give her the residence. It was one way of protecting herself against precisely what occurred here.
Mrs. Mullen was deprived of this safeguard.
We may be confident that in the first week of March, 1986, Mrs. Mullen wanted a will, and that is what her lawyer prepared for her. Had she been left alone, in all likelihood Mrs. Mullen would have executed this instrument as her will. Had this will been executed and she never made a deed, we would have had no lawsuit. When Martha Lee and Romeo decided in February, 1987, they had suffered all they could, nothing would have kept them from delivering Granny to Emma Lee and taking off to Florida. By the same token, nothing would have prevented Granny then tearing up the will if she wanted to.
Mrs. Mullen wanted a will.
Her children gathered on the night of March 16 and they, not she, decided she needed a deed, and they wrote it out. But they at least gave Mrs. Mullen some protection, because they wrote in the following sentence: "Any time they don't want to take care of me this deed is null and void."
This did not suit Martha Lee. It did not suit her for Mrs. Mullen to talk again with Stewart, Mrs. Mullen's own lawyer. She took Mrs. Mullen to a lawyer of her choice the next day, when Mrs. Mullen was sick, crippled, and with very poor hearing and eyesight, where a deed was drawn up which deprived Mrs. Mullen of the one protection she needed and wanted, the right to cancel the trade if Martha Lee and Romeo did not live up to their part of the bargain.
Mrs. Mullen was not given the one right she needed to protect herself from being cast off with no assets in the remaining year or two of her life. Also, she never got to see her lawyer, Stewart. Had he been permitted to consult and advise her, we would have an entirely different story.
The chancellor found that the Vegas did not produce evidence to show that this deed represented the true intent of Mrs. Mullen, and by no stretch of reasoning or argument can it be rationally maintained that he was manifestly wrong.
*1272 In reversing this case, what protection has the majority given this old lady? None.
In this case we do not have the blatant greed and avarice which unfortunately can be seen in many cases, Hendricks v. James, 421 So.2d 1031 (Miss. 1982), and In re McRae, 522 So.2d 731 (Miss. 1988), to name two. Mrs. Mullen truly loved her granddaughter Martha Lee, and Martha Lee was genuinely interested in Granny. Martha Lee started out with good intentions. Mrs. Mullen was old, however, and sick and troublesome. The burden got heavy and Martha Lee and Romeo decided that she could take no more. So they left. That may very well have been the prudent thing for them to do. Martha Lee, like the seed planted in stony soil, started off right, but died out before producing much fruit. When, however, Martha decided she could not fulfill her part of the bargain, she should have let Granny have the property back.
Then the streak of avarice and greed in Martha Lee was reinforced when she refused, and testified at trial that under no circumstances was she willing to deed the property back to Mrs. Mullen. Yet she knew what Granny's trade was with her. And she knew she had not kept her part of the bargain. Still, she chose to stick with what her lawyer had written up, not the trade, a deed which omitted the one protection Mrs. Mullen wanted and needed. It is undisputed in this record from Mrs. Mullen and Martha Lee's own mother, Mildred, that Mrs. Mullen told Andrews three times she wanted the deal to be null and void if Martha Lee did not stay and take care of her. Then, why was this one safeguard omitted? Andrews decided to leave it out. Why did he decide to omit it? Ask him and Martha.

LAW
There have always been respectable lawyers as well as judges who see no sense to the presumption of undue influence arising from a fiduciary relation transfer in the first place, and no doubt there always will be. I make no argument to those of that view, we will just simply agree to disagree.[2]
We made the following observation in the recent case, Estate of McRae, 522 So.2d 731 (Miss. 1988):
The legal principle which declares that a benefit conveyed by a beneficiary unto his trustee is presumptively void is not new. It was a long-settled principle of law prevailing in this country and Great Britain when this Court adopted it in Meek v. Perry, 36 Miss. 190 (1859). It has lost none of its vitality over the decades. See Hitt v. Terry, 92 Miss. 671, 46 So. 829 (1908); Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926); Bourn v. Bourn, 163 Miss. 71, 140 So. 518 (1932); Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959); Wofford v. Wofford, 244 Miss. 442, 142 So.2d 188 (1962); In re Will of Moses, 227 So.2d 829 (Miss. 1969); Hendricks v. James, 421 So.2d 1031 (Miss. 1982); Murray v. Laird, 446 So.2d 575 (Miss. 1984). While its application, like the tide, may ebb and flow, as long as cupidity and avarice remain a part of the human character, courts will retain this salutary principle.
Why is this rule necessary? It is because this is the only method available to frustrate the success of a greed in larcenous form, carried out with no one present but the dominant party and his dependent victim. It alone can *1273 nullify a closet advantage taken by the strong upon the weak and dependent, in which the malefactor only in the rarest instances would ever be detected.
This is why the law declares that when there is a fiduciary or confidential relation, and there is a gift or conveyance of dubious consideration from the subservient to the dominant party, it is presumed void. This is not because it is certain the transaction was unfair, to the contrary, it is because the Court cannot be certain it was fair. As stated in Meek v. Perry, 36 Miss. at 246, "if the court does not watch these transactions with a jealousy almost invincible, in a great majority of cases, it will lend its assistance to fraud." [Emphasis original]

Id. at 737.
Marsalis v. Lehmann, 566 So.2d 217, 221 (Miss. 1990).
It should first be noted that this Court makes an additional requirement in will contest cases before the presumption of undue influence ever arises. A devise or bequest to a fiduciary is perfectly valid if the dominant party in no way participated in procuring the will. If the legatee took no part in procuring the preparation or execution of the will, there is no presumption of procuring the will. If the legatee took no part in procuring the preparation or execution of the will, there is no presumption of undue influence. Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959); In re: Will of Adams, 529 So.2d 611 (Miss. 1988).
Our present problem arises from the fact that this Court overspoke, just barely overspoke, itself in Murray v. Laird, 446 So.2d 575 (Miss. 1984). We made an appropriate retreat from Murray v. Laird in Mullins v. Ratcliff, 515 So.2d 1183 (Miss. 1987). This is as far as we need to go, and I am saddened at my inability to persuade this Court against converting this slight retreat into a rout.
To understand, we need first look at the seminal case of Ham v. Ham, 146 Miss. 161, 110 So. 583 (1926), involving a suit to set aside a deed between two brothers who were partners in business.
Among other things, this Court held and stated:
"It is well settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and duties involved in it need not be legal, it may be moral, social, domestic, or merely personal." 2 Pomeroy Equity Jurisprudence (4th Ed.) § 956.
When such a relation exists ... "the transaction is not necessarily voidable, it may be valid, but a presumption of its invalidity arises which can only be overcome, if at all, by clear evidence of good faith, of full knowledge, and of independent consent and action." 2 Pomeroy Equity Jurisprudence (4th Ed.) § 957.
The burden of overcoming this presumption is on the party claiming under the conveyance, contract or gift.
110 So. at 584-585.
Then this Court concluded with the following paragraph (again quoting from Pomeroy):
The usual method of providing independent consent and action in such cases, and probably the only way it can be clearly proven, is by showing that in making the deed the grantor acted on the advice of a competent person, disconnected from the grantee and devoted wholly to the grantor's interest. 2 Pomeroy Equity Jurisprudence (4th Ed.) §§ 958 and 960, and notes on pages 2040, 2041. [Emphasis added]
Ham and its progeny did not say the only possible way independent consent and action could be proven was by advice from a competent person disconnected from the grantee and devoted wholly to the grantor's interest. We did say it was the usual method and probably the only way.
In Murray v. Laird, 446 So.2d 575, 578 (Miss. 1984), we extended what was probable to an absolute requirement, and this *1274 was where we overspoke, though barely. There we held that in order to rebut the presumption of undue influence arising from a fiduciary relation transfer the grantee must show by clear and convincing evidence:
1. Good faith on the part of the grantee/beneficiary;
2. Grantor's full knowledge and deliberation of his actions and their consequences; and

3. Advice of (a) competent person, (b) disconnected from the grantee, and (c) devoted wholly to the grantor/testator's interest. Wofford v. Wofford, 244 Miss. 442, 142 So.2d 188 (1962); Croft v. Alder, 237 Miss. 713, 115 So.2d 683 (1959); Thomas v. Jolly, 251 Miss. 448, 170 So.2d 16 (1964).
As we subsequently noted in Mullins v. Ratcliff, 515 So.2d 1183, 1193 (Miss. 1987), the independent advice from a disconnected person was not an absolute.
It is well now to address those cases subsequent to Murray v. Laird, and the way they reached us.
Mullins v. Ratcliff was a case in which the chancellor upheld a deed from a hydrocephaletic man to his sister. Matt Lewis, the brother, was illiterate, and could not walk. On the other hand, credible disinterested witnesses, including his doctor, testified he was mentally competent. He was living with his sister at the time of the deed, and she had been his guardian. However, two years before the execution of the deed, Lewis told a neighbor friend, when the two of them were alone, that he intended to give the land to his sister and her husband. She was not connected to any of the parties. Also, some fifteen years after he had executed the deed, he told another neighbor that he had done so because his sister took care of him.
In upholding the deed the chancellor stated:
There appear to be no hard and fast rules to say what evidence is sufficient to rebut a presumption of undue influence. It is persuasive to this court, however, that the grantor disclosed his intention to a disinterested person prior to executing the deed and subsequently acknowledged to another disinterested person some fifteen years later that he had made such a deed.
We held that under our appellate review we could not say the chancellor was manifestly wrong. Also, it is clear from this case that a court could be satisfied from the fact that the execution of the deed represented the true and actual intent of the grantor, which cannot with confidence be said of Mrs. Mullen's deed. When a court can be satisfied of this, it need go no further.
In re Estate of Harris, 539 So.2d 1040 (Miss. 1989), is another case in which this Court affirmed a chancery court upholding a devise in a fiduciary relationship. Mrs. Harris, an elderly woman, became dependent upon her neighbor Bradley to advise her, run errands for her, manage her checking accounts. One day she asked him to locate an attorney to draft her will. Bradley saw a local attorney on the streets of Columbus, an attorney he had never used and only casually knew, and told him that Mrs. Harris was in the local hospital and wanted to have a will drafted. The attorney went to the hospital alone, and saw that she was too ill to discuss the will. He declined to draft it. Thereafter, Bradley drove Mrs. Harris to the attorney's office, where he left the two of them alone. All discussions as to the will were in private between the attorney and Mrs. Harris.
We stated that we could not hold that the chancellor was manifestly wrong in upholding the will. Bradley had no connection with the attorney, did not employ him, and merely directed him to go see Mrs. Harris. Thereafter, he simply took Mrs. Harris to the attorney's office. And again, the case came before us when the chancellor upheld the transaction.
Finally, Marsalis v. Lehmann, 566 So.2d 217 (Miss. 1990), involved the granting of summary judgment on the existence of a Mrs. Harris to the attorney's office. And again, the case came before us when the chancellor upheld the transaction.
*1275 Finally, Marsalis v. Lehmann, 566 So.2d 217 (Miss. 1990), involved the granting of summary judgment on the existence of a fiduciary relationship and failure to overcome the presumption of undue influence. The appeal was only that the court erred in holding no issue of fact remained as to rebutting the presumption. The attorney in that case had for many years been the attorney for the testatrix and there was no showing that the beneficiary was active in any way in procuring the execution of the will. We reversed for full trial to determine factually whether there was undue influence. Mullins, Harris and Marsalis are a far cry from this case.
In those cases where you admittedly have a confidential relations transfer from a dependent to a dominant party, it seems to me that the ultimate test should be something on the order of the following:
Excluding the testimony of the grantee, those acting in the grantee's behalf (such as the attorney), and any others who could have a direct or indirect interest in upholding the transfer (such as grantee's family), is there any other substantial evidence, either from the circumstances, or from a totally disinterested witness from which the court can conclude that the transfer instrument represented the true, untempered, genuine interest of the grantor?
If the answer to this question is yes, then it becomes a question of fact whether or not there was undue influence. If the answer is no, then as a matter of law the transfer is voidable.
Mullins v. Ratcliff clearly passed this test. The grantor told two totally disinterested witnesses, one two years before the act, and the other fifteen years subsequently, of his action and why.
Martha Lee just as clearly flunked.
I would affirm.
DAN M. LEE, P.J., and PITTMAN and McRAE, JJ., join this opinion.
NOTES
[1] To constitute sufficient grounds for setting aside a deed, weakness of intellect must be accompanied by some other factor such as inadequate consideration or existence of a confidential relationship. Cunningham v. Lockett, 216 Miss. 879, 63 So.2d 401, 404 (1953); Puryear v. Austin, 205 Miss. 590, 606, 39 So.2d 257, 260-61 (1949). Here the chancellor made no finding as to whether Mrs. Mullen suffered from a mental weakness affecting her ability to understand the nature and consequences of her actions. The weight of the evidence is to the contrary. Because the confidential relationship is conceded, Mrs. Mullen's mental capacity is considered in determining whether the presumption of undue influence has been overcome.
[1] There was a fourth child also, who had been dead a number of years.
[2] Recently, I heard what to me is the most asinine statement of all: that in small towns there would be no disinterested lawyer to prepare a will or deed. In my forty years of practice in a small town, I never heard one reputable lawyer (or, come to think of it, disreputable lawyer) make such a complaint. Moreover, perhaps because small town lawyers generally are well acquainted with their fellow citizens, they are best able to recognize most of the cases where the weak are taken advantage of by someone they trust and depend upon, and the consequent need for the rule. Any astute, honorable small town lawyer will see that the weak have independent advice, aside from any legal requirement. We need not worry about the honorable, perceptive lawyer.

This rule is to guard against the slipshod, careless or dishonest lawyer.